EDWARD COWLEY, Plaintiff in Error, *v.* THE PEOPLE OF THE STATE OF NEW YORK, Defendant in Error.

Plaintiff in error was indicted under the provision of the act " to prevent and punish wrongs to children " (§ 4, chap. 122, Laws of 1876), which declares it to be a misdemeanor for one " having the care or custody of any child " to cause or permit the child's life to be endangered or health to be injured, etc. The charge was that the accused willfully neglected to provide the child named, of whom he had the care and custody, with proper and sufficient food, clothing and medicine; thus causing his health to be injured. It appeared on trial that the accused was the secretary of a benevolent institution, having a board of trustees and subject to visitation of the Supreme Court and the State Board of Charities and Corrections. He was, however, in actual charge, provided for the household, and was the director of all its internal affairs, and had the actual care and custody of its inmates. *Held*, that he had the care and custody of the child within the meaning of the statute.

The court declined to charge that the prisoner had no right to receive and distribute the revenue provided by the legislature for said institution.

It did not appear that the ability to supply more and different food or other needful things depended upon that revenue, but it appeared that he had other means in his power to use. *Held*, no error.

The court charged that if the prisoner took the child into his care and custody the law imposed upon him the duty of giving him food, clothing, care and medical attendance reasonably necessary and proper to keep his life from danger and his health from injury. Also, that if he did not have the means to provide what was needful for the child, it was his duty to apply to the public authorities for aid ; and that if the prisoner neglected so to do and life was endangered or health injured he was guilty. *Held*, no error.

One who, with no natural or legal duty, voluntarily seeks and assumes the care and custody of a child, is amenable to the statute if he fails to perform the duty required, to the injury of the child. It is not requisite to aver or prove that he had means of support ; he must either perform his duty or surrender such care and custody.

*Reg.* v. *Chandler* (Dearsley's Cr. Cases, 453), and *Reg.* v. *Downes* (1 Q. B. Div. 25), distinguished.

In putting hypothetical questions to expert witnesses counsel may assume the facts in accordance with his theory of them ; it is not essential that he state the facts as they exist.

The indictment charged the offense to be on a day specified ; the proof was of continuous acts and omissions in giving the child insufficient food ; no one specific act was shown to have been done on any given day. *Held*, that the statute did not require the offense to be made out by proof of an act on any particular day ; that the indictment was good averring the offense on a day specified, and proof of repeated and continuous acts or neglects connected in operation resulting in the effect condemned by the statute was sufficient to sustain the indictment.

The prosecution offered in evidence photographs of the child, one taken before he went to the institution, and others taken about two weeks after he was taken away. It was proved that said photographs were accurate pictures as the child appeared at the times they were taken ; also, that the child improved in condition after he was taken from the prisoner's custody and before the last photographs were taken. These were received under a general objection. *Held*, no error.

Photographic pictures when shown to be correct resemblances of the person or thing represented are competent as evidence.

*Hynes* v. *McDermott* (82 N. Y. 41), distinguished.

(Argued December 16, 1880 ; decided January 18, 1881.)

ERROR to the General Term of the Supreme Court, in the first judicial department, to review judgment entered upon an order made June 11, 1880, affirming a judgment entered

upon a verdict convicting the plaintiff in error of a misdemeanor. (Reported below, 21 Hun, 415.)

The particular offense charged and the material facts appear in the opinion.

*Charles Cowley* for plaintiff in error. As "the active manager and representative" of the corporation which had the care and custody of the boy, the plaintiff in error did not come within the meaning of the act under which he was indicted. (*Ferrett* v. *Atwill*, 1 Blatch. 151; *U. S.* v. *Sheldon*, 2 Wheat. 119; *Daggett* v. *State*, 4 Conn. 61; R. S. title 7, § 8; title 8, chap. 1, §§ 8, 18, 19.) The fact that the person charged with this offense has the means of doing what the act requires, is a necessary ingredient in this offense, and must be both alleged and proved. (*Regina* v. *Chandler*, Dearsley's C. C. 453; *Queens* v. *Downs*, 1 Q. B. Div. R. 25, in 1875.) It was error to charge that if the plaintiff in error did not have the means, etc., it was his duty to apply to the public authorities for relief. (*Comm.* v. *Green*, 1 Ashmead, 289; *People* v. *Brooks*, 1 Den. 457; *Comm.* v. *Kirby*, 2 Cush. 577.)

*Daniel G. Rollins* for defendant in error. The photographs of the child showing his condition at the time he was taken from the custody of the plaintiff in error were properly received in evidence. (*Ruloff* v. *The People*, 45 N. Y. 213; *Cozzens* v. *Higgins*, 1 Abb. Ct. of App. Cas. 453.) Any offense which is of such a nature that it may either be committed upon a single day, or continue over several days, may properly be described in an indictment as having been committed on a day certain; and such indictment will be sustained by proof that the various acts or neglects constituting the offense were committed or omitted upon a single day, or upon several days. (1 Bishop's Cr. Proc. [3d ed], § 397; *Regina* v. *Firth*, 11 Cox's C. C. 234; 1 Chitty's Crim. Law, 225 [star paging]; *Rex* v. *Bleasdale*, 2 Car. & Kerw. 675; *Reg.* v. *Welman*, Dearsly's C. C. 188; *Brown* v. *State of Ohio*, 18 Ohio St. 496; *The King* v. *Moore*, 2 Leach, 575.) The instruction

to the jury that the neglect must be found by them to be willful, that is knowing and intentional, was correct. (*The People* v. *Brooks*, 1 Den. 457; *Comm.* v. *Green*, 1 Ashmead, 299; *King* v. *Holland*, 5 Durn. & East, 618; *Reg.* v. *Bubb*, 4 Cox's C. C. 455; *Reg.* v. *Downs*, 13 id. 111; *Gardner* v. *People*, 62 N. Y. 299.) The charge that "if the defendant did not have the means to provide for the boy Louis Pictor, it was his duty to apply to the proper authorities, and if he willfully neglected so to do, he is guilty of the offense charged," was proper. (*Queen* v. *Mabett*, 5 Cox's C. C. 339; *Queen* v. *Downs*, 13 id. 111.)

FOLGER, Ch. J. An act of the legislature was passed in 1876, entitled "An act to prevent and punish wrongs to children." (See Laws of 1876, chap. 122, p. 95.) It enacts that whoever, having the care or custody of any child, shall wilfully cause or permit the life of it to be endangered, or the health of it to be injured; or it to be placed in such a situation that its life may be endangered or its health be likely to be injured, shall be guilty of a misdemeanor. (Id., § 4, p. 96.) The plaintiff in error was indicted under this statute. We have to do with but two of the counts in the indictment, the first and the second. The first charges that he wilfully neglected to provide a child known as Louis Kulkusky, *alias* Louis Victor, with, and to give to him, proper, wholesome and sufficient food, clothing and means of cleanliness, and thereby did wilfully cause and permit his health to be injured. The second charges that he did wilfully neglect to provide the child with, and to give and administer to him, proper and sufficient medicine and medical attendance when the child was sick, diseased and ailing and requiring the same, and did wilfully cause and permit his health to be injured. Each of these two counts charge that the plaintiff in error then had the care and custody of the child. They allege the neglect to have been on a day named. On the trial of the indictment the jury found the plaintiff in error guilty. No question is made by the plaintiff in error but that the wilful deprivation of suf-

ficient food, in quality, kind and quantity, and of needed medicine and medical attendance, are within the meaning and intention of the fourth section of the act, as we have given it above.

1. The first question that arises on the points made and argued in this court for the plaintiff in error is, that he does not come within the words of the act, "whoever having the care and custody." It is argued that he did not have the care and custody of the child. It seems that the plaintiff in error was the secretary of a benevolent institution duly incorporated, known by the name of "The Shepherd's Fold." It had a board of trustees. It was subject to the visitation of the Supreme Court and of the State Board of Charities and Corrections. It seems, however, that the plaintiff in error was in the actual charge of the house and the household in which the child dwelt. He was the head of the household, the provider for it, the authoritative director of all its internal affairs. Nearly every practical act in the management and conduct of it was done by him or was under his guidance. Had he given charge that the child should have other or more food, different or more raiment, more frequent administration of medicines, or medical attendance, they would have followed. What the child had of these, and that he had no more than he did have, was in conformity to his rules and because of his directions. The care of the household and its inmates, the custody of them, centered in him. He was the master there, and others were under him. It is idle to claim that the actual physical care and custody of the child was not in him, as the practical arbiter of the daily routine of the house and the family. True, penal statutes must be construed strictly when against the accused person. The letter of the act may not be extended by implication or equitable construction. But even in penal laws, the intention of the legislature is the best method to construe the law; though truly, that is to be deduced from all the words that it uses. (*Heyden's* case, 3 Co. 18, 19, *n.* B.) We think that when the legislature said that whoever, having the care or custody of any child, shall wil-

fully permit the life of such child to be endangered, it meant by those words a sentient being who could will and do of his own good pleasure; and that such a one is not without the close purview of the act, because an officer of a corporation, an artificial entity that cannot will or do, save through sentient beings. It may be conceded that the legal control of the child was in the corporate body, which was the ultimate depositary of power and authority over it, and which could, through its board of trustees, supersede the plaintiff in error in the actual control, care and custody of the boy. But we notice that in the first section of the act the legislature has used the word "control" in the alternative with the word care and with the word custody; and in such juxtaposition with other phrases as to convey the idea of a legal power to direct and dispose of without an actual physical care and custody. It has been thought that a corporation aggregate could not be indicted for a misfeasance, for that it could not be liable for a crime of which a corrupt intent, or *malus animus*, was a part. (1 Arch. Cr. Pr. and Pl. 51 [*9], note 1.) But in later days it has been held otherwise. (Id.) It has, however, for years been the law of this State that the officers of a corporation might be indicted for the neglect of a duty resting upon it. (*Kane* v. *The People*, 3 Wend. 363.) Clearly the plaintiff in error did have the actual immediate physical care and custody of the child. The jury have so found, and they have also found that he did wilfully permit the health of the child to be injured. The case of the plaintiff in error, in our judgment, is within the words of the statute, it not being questioned by him that the conduct charged against him is within the meaning of the fourth section.

2. It was not error for the learned recorder to decline to charge that the plaintiff in error had no right to receive or distribute the revenue provided by the legislature. The request so to do presented an immaterial issue. It was not in proof that the ability to supply more and different food or other needful things depended upon that revenue. Donations by the charitable and payments directly to the plaintiff in error from some

of the relatives of children were some of the means in his power of use. Nor is the excuse set up by him that there was not enough in quantity and variety of provisions in his reach; while it is shown that the services of Dr. Hawes were gratuitous. Nor was it error for the learned recorder to say to the jury, that it appeared that the plaintiff in error received the boy from his father and undertook the care and custody of the child. If it is excepted to as a legal proposition, what we have said covers that. If it is excepted to as passing upon a question of fact by the court, it is plain that it was not so appreciated by the jury. The court was abundantly cautious to tell the jury again and again that the questions of fact were for them. And, at the request of the plaintiff in error, it did instruct the jury that if they found that the child was in the custody of the corporation, and not solely in the personal care and custody of the defendant, they must acquit the defendant.

3. Another question raised is as to the admissibility of the hypothetical questions put to medical experts sworn as witnesses. The claim is that a hypothetical question may not be put to an expert unless it states the facts as they exist. It is manifest, if this is the rule, that in a trial where there is a dispute as to the facts, which can be settled only by the jury, there would be no room for a hypothetical question. The very meaning of the word is that it supposes, assumes something for the time being. Each side, in an issue of fact, has its theory of what is the true state of the facts, and assumes that it can prove it to be so to the satisfaction of the jury; and so assuming, shapes hypothetical questions to experts accordingly. And such is the correct practice. (*Erickson* v. *Smith*, 2 Abb. Ct. App., Dec. 64; *The People* v. *Lake*, 12 N. Y. 358; *Seymour* v. *Fellows*, 77 id. 178.) This subject has been under our consideration in *Guiterman* v. *The Liv., N. Y. & Phil. S. S. Co.*,* decided at this term, and needs no further discussion in this case. It was not error to take the questions.

4. Another point made in this court arises in this wise: The indictment charges the offense to have been on a specific

* *Ante*, p. 358.

day, the 26th of December, 1879. The proof was of a continued course of conduct, consisting in the giving to the child food insufficient in quantity and unvaried in kind, and like continuous acts or omissions. There was no one act specifically shown by the proofs, that was proven to have been done on any given day. It is claimed that the fourth section of the statute requires that an act, to make out the offense declared by it, should be done on some one day. Doubtless one might cause the life of a child to be endangered, or its health injured, as are the words of the section, by a single act; as by putting him to ride upon a vicious and ungovernable horse, or by putting him to tend a dangerous piece of machinery. That could be done on a single day. Doubtless, also, he might cause the same by a course of conduct made up of successive acts or negligences; as by putting him at menial service in a pest-house and keeping him there, or by continuously exposing him to the rigor of the seasons with a lack of clothing. That might run on for many days. Both the single act and the course of conduct might endanger life or injure health; and if one is within the purview of the statute, why is not the other? Take then the other word of the statute — " permit." It conveys exactly the idea of what is claimed to have been shown by the facts in the case, and what we must, from the verdict, assume was shown to the satisfaction of the jury. There was an allowance, a sufferance, a toleration, an authorization by the plaintiff in error of a routine of diet that the medical witnesses pronounced injurious to the health of children. With the care and custody of the child in his hands, and with the power to change that routine, and with the duty of knowing that it ought to have been changed, he suffered it to go on; he started it and (*per* and *mitto*) he sent it through the course of the days and weeks and months during which the boy was with him. We think that the point is not well taken, that the statute requires that the offense be made out by proof of an act on a given day.

Akin to this point is the other, that the evidence was wholly insufficient legally to warrant the jury, under any circumstan-

ces, in rendering any verdict save one of acquittal; and that the court should have directed the jury to acquit. It is true, the indictment does aver as the time a given day, the 26th day of December, A. D. 1879, and it is argued that the evidence should have shown a guilty act or omission on that day, and on that alone, or the offense is not made out. As a general rule, the time laid in an indictment is not material. (*The People* v. *Van Santvoord*, 9 Cow. 655; *Jacobs* v. *Comm.*, 5 S. & R. 316.) And hence evidence may be given of an offense done on another day. It is also said, that where the offense consists in neglect or non-performance, the allegation of a specific day is good, and the allegation of divers other days renders the indictment bad only as to to those days uncertainly alleged, leaving it effectual as to the day specified. (2 Hawkins' P. C., chap. 25, § 79; Starkie's C. P. 60–61; 1 Chit. Cr. Law, 218, 180.) These authorities are cited and approved in *People* v. *Adams* (17 Wend. 475). And see *Rex* v. *Dixon* (10 Mod. 335–338; *U. S.* v. *La Coste*, 2 Mason, 129). The offense in this case does not consist of a single act, or a single omission. From its nature it is made up of a continuity of acts or of omissions, neither of which may be enough by itself, but each of which comes in with all the rest to do the harm and make the offense. In such case, an indictment is good that avers the offense on a given day, and the proof sustains the averment, when it shows repeated and continuous acts or neglects connected in operation, the result of all of which is the act or effect reprehended by the law. (1 Bishop's Cr. Pro., book II, chap. XVIII, § 248 and note 1; 1 Chit. Cr. Law, * 225; 1 Starkie Cr. Pl. [2d ed.] 57.)

We think that this point is not well taken. There was testimony of what was the food given to this boy from day to day; there was testimony that it was not enough in quantity or variety for the healthy nutrition of a growing child; there was testimony of the state of body and of mind in which the lad was found, after months of feeding thus; and that that state was a result of that feeding. We express no opinion whether or no this testimony was overborne by other in the case. That was for the triers of fact. It was proper to submit it to them.

It seems from the error-book, that the motion to direct an acquittal was to some extent put upon the ground that the medical testimony presented an alternative, to wit, that the state of the boy might have come from insufficient food, or from incapability of his system to well assimilate food. True, the medical experts did admit the possibility of the latter; but yet it was for the jury to say where lay the strength of the probability, and of the reason for it. Having passed the question of the care and custody of the boy being in the plaintiff in error, and the question whether the statute and the indictment required proof of some act on a given day, then, on the conflicting testimony, these were pure questions of fact, whether the boy was suffering to the point of injury to his health for the want of proper food, and whether the lack of food was wilfully caused by the plaintiff in error. The court was right in leaving those questions to the jury.

5. The learned recorder told the jury that if the plaintiff in error took the child into his care and custody, the law imposed upon him the duty of giving such food, clothing, care and medical attendance, as was reasonably necessary and proper to keep the life of the child from danger, and his health from injury; and that if he intentionally neglected to do it, and life was thereby endangered or health injured, he was guilty under the first two counts of the indictment. It is made a point, that this instruction is erroneous, in that it did not state that there was no duty to give food without the means of procuring food. We do not think that in this case there was need of the addition to the instruction that is insisted upon. There is a difference between a natural duty, or a duty imposed by operation of law, and a duty assumed voluntarily and that may be put off voluntarily. A father, who has the care and custody of a child by law of nature, and whose duty to provide for it is correlative, may perhaps say in excuse of non-performance, when indicted at common law for neglect, that he had not the means to get food for the child or himself. Or a relative, who takes a child bereft of parents, into his care and custody, because of the ties of blood, may perhaps, in such case, make the

same excuse. In *Hogan's Case* (2 Den. Crim. Cas. 277), it is recognized, that had the charge been the common-law offense of neglecting to provide for a child so as to injure its health, there must have been averment and proof of means of support. But one, who with no natural or legal duty, voluntarily takes, nay, seeks for the care and custody of a child, must either do his duty to it in giving it food, or must yield to others, or to the public, the care and the opportunity to feed, or he becomes amenable to this statute, which makes no mention of having means of support, as an ingredient of the offense created. Though he may not have the money wherewithal to buy bread and meat for it, he has the right to seek the charity of the kind-hearted, or if he will not do that, to ask for the public alms that the law of the State provides for all its poor. Having undertaken to care for the life and health of the child, he cannot excuse himself therefrom by the plea that he had not counted the cost, that he made an improvident promise. He must bestir himself to get means, or must give up the care that he is unable to keep as it should be kept, and which he is not bound to keep to the harm of the subject. The case of *Reg.* v. *Chandler* (Dearsley's Crim. Cas. 453), does not conflict with this view. There the indictment was for the common-law offense, and the allegation was that the prisoner was able and had means to maintain her child, but there was no proof to sustain the allegation. In *Reg.* v. *Downes*, (1 Q. B. Div. 25), though one of the specific questions put to the jury and found affirmatively, included the having of means by the prisoner, yet the judgment puts no stress upon that fact, nor does the statute, upon which the indictment was based, require it. It has been said by MARTIN, B., and ERLE, J., in *Reg.* v. *Mabbett* (5 Cox's Crim. Cas. 339), that it is the bounden duty of all persons having children, when they themselves cannot support them, to endeavor to obtain the means of getting them support; and that if they will wilfully abstain from going to the Union (i. e. the alms-house), where they have by law a right to support, and the children die, they are criminally responsible. That was a case of a mother indicted for manslaughter of a

child, by not giving it enough food. Besides there was no pretense in the case in·hand, that there was a want of means, or of proper provision in the household. On the contrary, the testimony tended strongly to show that there was in the house the material for giving to the child, just that which the medical testimony showed he should have had. The instruction, the lack of which is complained of, would have been pointless, because immaterial. The court did not err in the instruction as given. What we have said covers the exception to that part of the charge, in which the learned recorder told the jury that if the plaintiff in error did not have the means to provide what was needed for the child, it was his duty to apply to the proper public authorities for public aid. The institution of which the plaintiff in error was an officer, and which was in great measure set on foot by him, was professedly a benevolent and charitable one. Its avowed purpose was to feed, clothe, and rear the needy, in the main gratuitously. It does not answer a charge, that having assumed to do this, it was not done and was wilfully neglected, to say that "the plaintiff was not obliged to resort to mendicancy." He was bound to do that which he undertook to do; and if the charitable means at his disposal failed, it was not mendicancy to go to the ordained public supplies, to eke out his lack. The charge was not, that having taken the boy, that was the duty of the plaintiff in error rather than that health be injured, and that he could not do his duty but thereby; the charge applied to the facts of the case, and took them all in its grasp, and held out the idea, not only of taking the care and custody, but of holding on to it, rather than when there came inability to do it well, giving it up to the public authorities, or getting from them aid to do it.

6. It is also made a point that it does not appear in the case, that the plaintiff in error knew of the fact that the lad was suffering for lack of food enough and proper. True, no witness testifies directly to that knowledge. But the jury were charged, that the indictment averred that the conduct of the plaintiff in error was wilful; and that by that term was meant knowingly and intentionally to cause the result; and that the

intent must be proved to their satisfaction.   We must assume that the jury obeyed the law as thus laid down, and did find that the plaintiff in error kept on in his course of conduct toward this child, conscious that a continuance of it would endanger life or injure health.  And we cannot say that there was no testimony to that end.

7.  On the trial, the people offered in evidence, pictures taken by the photographic process.   One picture was claimed to be that of the boy Louis, before he went into the care of the plaintiff in error.   Others were of him about two weeks after he had been taken from the custody of the plaintiff in error and to St. Luke's Hospital.   They were offered to show the bodily appearance of the child at the several times of taking the pictures.   The first one was proven to be a correct likeness of him, a perfect picture of him when he came to this country. The photographic operator who took the others, testified that he was a photographer, doing that business in New York city; that he took them about the sixth of January, which was about two weeks after Louis was taken to the hospital; that they were exactly correct likenesses of Louis, as he appeared at the time of taking them.   The house physician at the hospital, testified that the last taken pictures represented the child as he appeared at the hospital, only that from the position in which the pictures were taken, they did not show the emaciation as great as it really existed.   Another medical witness, who saw and examined the child a while after the last pictures were taken, testified that they were about correct.   Another such witness testified that they were correct.   It was also in evidence that the boy improved in condition after he was taken into the hospital, so that the fair inference is, that if the pictures were a correct likeness of him when taken, they did not show a worse appearance of him than it was when he left the house of the plaintiff in error.

The plaintiff in error objected to the reception of these pictures in evidence.   The objection made was general, and did not state the grounds upon which it rested.   We must assume that the ground was either general, that photographic pictures

may never be properly received in evidence, or special, that these pictures were not, for some reason peculiar to them, competent evidence. As to the latter, as we have seen, there was evidence that they brought into court a faithful likeness of the boy as he appeared when they were taken; and that though they were taken at a lapse of days after he left the custody of the plaintiff in error, he had in that lapse bettered in physical condition, so that his appearance then was more favorable to the plaintiff in error, than it was on the day on which he was taken to the hospital. Nor were they offered for other purpose than to show the appearance of the subject, as it was presented to one looking upon him; in other phrase, to show a physical fact, that the eye of any human being, looking upon the boy, could have taken in. So far as the circumstances of the taking of these pictures, and the purpose of them in evidence were concerned, in our judgment they were properly received, if copies of objects taken by that process are ever competent in evidence. And we are now to consider whether they are, under a proper state of facts, and for a proper purpose, competent evidence. We know not of a rule, applicable to all cases, ever having been declared, that they are not competent. Nor do we see, in the nature of things, a reason for a rule that they are never competent. We do not fail to notice, and we may notice judicially, that all civilized communities rely upon photographic pictures for taking and presenting resemblances of persons and animals, of scenery and all natural objects, of buildings and other artificial objects. It is of frequent occurrence, that fugitives from justice are arrested on the identification given by them. "The Rogues' Gallery" is the practical judgment of the executive officers of the law on their efficiency and accuracy. They are signs of the things taken. A portrait or a miniature taken by a skilled artist, and proven to be an accurate likeness, would be received on a question of the identity or the appearance of a person not producible in court. Photographic pictures do not differ in kind of proof from the pictures of a painter. They are the product of natural laws and a scientific process. It is true that in the hands of a bungler, who is not apt in the use of the process, the result may not be

satisfactory.   Somewhat depends for exact likeness upon the nice adjustment of machinery, upon atmospheric conditions, upon the position of the subject, the intensity of the light, the length of the sitting.   It is the skill of the operator that takes care of these, as it is the skill of the artist that makes correct drawing of features, and nice mingling of tints, for the portrait. Most of evidence is but the signs of things.   Spoken words and written words are symbols.   Once a deaf mute, born so, was presumed in law an idiot (1 Hale, 34) ; but later days look upon him as not incompetent to be a witness, if he in fact have understanding and knows the nature of an oath.   (*Ruston's Case*, 1 Leach, Cr. Cas., 408.)   He is now taught to give ideas to his fellow men by signs, and his deprivation of some of the common faculties of humanity does not exclude him from the witness-box.   The signs he makes must be translated by an interpreter skilled and sworn.   So the signs of the portrait and the photograph, if authenticated by other testimony, may give truthful representations.   When shown by such testimony to be correct resemblances of a person, we see not why they may not be shown to the triers of the facts, not as conclusive, but as aids in determining the matter in issue, still being open, like other proofs of identity or similar matter, to rebuttal or doubt.   A witness who speaks to personal appearance or identity, tells in more or less detail the minutia thereof as taken in by his eye. What he says is a description thereof, by one mode of signs, by words orally uttered.   If his testimony be written instead of spoken, and is offered as a deposition, it is a description in another mode of signs, by words written ; and the value of that mode, the deposition, depends upon the accuracy with which his words uttered are put into words written.   Now if he has before him a portrait or a photograph of the person, and it shows to him a correct copy of that person, if it produce to his view a correct description, which he testifies is a likeness, why may not that be given to the jury, as a description of the person by the witness in another mode of signs?   The portrait and the photograph may err, and so may the witness.   That is an infirmity to which all human testimony is lamentably liable.   But when care is taken to first verify that the process by which the

photograph was taken was conducted with skill and under favorable circumstances, and that the result has been a fair resemblance of the object, the picture produced may, in many of the issues for a jury, be an aid to determination. Nor are the cases adverse to these views. In *Cozzens* v. *Higgins* (1 Abb. Ct. App. Dec. 453; *S. C.* (3 Keyes, 206), this court held a photograph competent to show the condition of a cellar floor, caused by the acts of one digging down on premises adjoining. In *Udderzook's Case* (76 Penn. St., 340) one was held competent to show the appearance of a man on a question of identity, and on the further question of the identity of a mangled dead body as that of the man. In *Ruloff* v. *The People* (45 N. Y. 213), this kind of picture was held competent on the question of identity of persons. In *Marcy* v. *Barnes* (16 Gray, 162), photographic copies, on an enlarged scale, of writings conceded to be genuine, and of writings disputed, were held competent for submission to the jury with the writings themselves, on a question of genuineness of handwriting. In *Hynes* v. *McDermott* (22 Al. Law Jour., 368 \* ); this court, in a question of expert evidence by comparison of handwritings, held it incompetent to compare a photographic copy of a writing not produced in court, with a genuine writing before the court, the more so as the accurate resemblance of the photographic copy was not well enough shown.

In our judgment, the learned recorder did not err in taking the photographs into the evidence.

These views take in the questions made on the printed points, and the oral argument presented in this court. Some reference is made in the printed brief to the questions raised at General Term. It is not understood that any of them are renewed in this court, save what were formally presented to us at length.

We find no error of law calling for a reversal, and the judgment should be affirmed.

All concur, except MILLER, J., absent at argument.

Judgment affirmed.