JACKSON v. BURNHAM.

1. EVIDENCE—HYPOTHETICAL QUESTIONS.

A hypothetical question framed upon the assumption that the evidence tends to prove certain facts, and which is within the probable or possible range of the evidence, is not objectionable.

2. APPELLATE PRACTICE—RULE OF DECISION.

It being the exclusive province of the jury to determine the probative force of the testimony, and the facts thereby established, the verdict will, upon review, be accepted as conclusive as to such matters.

3. MALPRACTICE.

While physicians are not responsible for the errors of an enlightened judgment where good judgments may differ, they will be charged with error only where such errors could not have arisen except from want of reasonable skill and diligence; yet, whether errors of judgment will or will not make him liable in a given case depends not merely that he may be ordinarily skillful, but whether he has treated the case skillfully, or has exercised in its treatment such reasonable skill and diligence as is ordinarily exercised in his profession.

4. SAME.

A physician or surgeon possessing the requisite qualifications applying his best skill and judgment with ordinary care and diligence to the

examination of a case, is not responsible for an honest mistake or error of judgment as to the disease or best mode of treatment. But if the ordinary and established practice of the profession is to treat an ailment in a particular manner and the attending physician adopts some other mode that proves injurious, it is immaterial how much skill he possessed, since his failure to exercise it constitutes negligence.

5. SAME.

When a particular mode of treatment is upheld by a consensus of opinion among the members of the medical profession, it should be followed by the ordinary practitioner, and if he sees fit to experiment with some other mode, he does so at his peril.

6. IMMATERIAL ERROR.

Only prejudicial error constitutes a ground for reversal. If the court can see that upon the whole testimony and under the governing principles of law, the result reached in the trial of the cause is a just one, the judgment must be upheld.

## Appeal from the Court of Appeals.

THIS action was originally brought by Jesse R. Jackson, in the district court of Arapahoe county, against N. G. Burnham, to recover damages for malpractice.

The complaint avers, in substance, that the defendant was a physician engaged in the practice of his profession at the city of Denver; that plaintiff employed him to treat him for a malady from which he then suffered; that defendant entered upon such employment, and undertook, as a physician and surgeon, to administer medicines and cure him of said malady; "that said defendant did not use reasonable, ordinary, due and proper care or skill in his treatment of this plaintiff, and in endeavoring to cure this plaintiff of the said malady in this, that this plaintiff being afflicted with phimosis, or an adherence of the prepuce or foreskin of the penis to the head thereof, and a consequent swelling thereof, the said defendant, instead of slitting up the prepuce or foreskin to the corona, etc., and thus freeing the glands of the penis and allowing circulation, and using other appliances and remedies, as is the reasonable, usual and ordinary method adopted by the profession in such cases as this, to prevent gangrene

and sloughing, etc., wrongfully, negligently and unskillfully applied and directed to be applied and kept on the penis of this plaintiff a flaxseed meal poultice, which application, under the circumstances and in the condition of plaintiff's malady, aggravated said malady, and accelerated that condition of gangrene and sloughing which followed, and which might have been prevented by proper treatment, and that thus the said defendant wrongfully, negligently and unskillfully treated this plaintiff, and wrongfully, negligently and unskillfully neglected to use the proper and ordinary means and care whereby this plaintiff's member aforesaid might have been saved and cured or relieved.

"*Fourth*. That by reason of the premises, the wrongful, negligent, careless and unskillful treatment of this plaintiff by the said defendant, and without any fault on the part of the plaintiff, gangrene and sloughing set in, and it became necessary to amputate, and the physicians attending this plaintiff did amputate his penis wholly from the body; that this plaintiff has been injured in his health and constitution;" etc., and prays judgment in the sum of $20,000.

Defendant, for answer, admits that he was a practicing physician and was called to attend upon and administer medicine to plaintiff, but denies generally each and every other allegation contained in the complaint. The cause was tried to a jury; verdict and judgment rendered in favor of plaintiff for the sum of $5,000. From this judgment the defendant appealed to the court of appeals, which court reversed the judgment of the district court. From this judgment, plaintiff brings the case here on appeal.

Mr. A. H. WYCKOFF and Mr. C. H. BRIERLY, for appellant.

Messrs. WOLCOTT & VAILE and Mr. HENRY F. MAY, for appellee.

MR. JUSTICE GODDARD delivered the opinion of the court.

The numerous errors assigned are directed to the admis-

sion of improper testimony and to the giving and refusing of instructions. Those assigned upon the admission of testimony are principally based upon the court's permitting the expert witnesses on the part of plaintiff to answer the hypothetical question propounded—*first*, because it was not limited to undisputed facts; and, *second*, because it assumed facts that were not in evidence. This objection is not well taken upon either ground. A hypothetical question is framed upon the assumption that the evidence tends to prove certain facts, and if within the probable or possible range of the evidence, it is unobjectionable. *Gottlieb v. Hartman*, 3 Colo. 53; *Cowley v. The People*, 83 N. Y. 464; *Harnett v. Garvey*, 66 N. Y. 641; *Guiterman v. L. N. Y. & P. S. Co.*, 83 N. Y. 358.

In the hypothetical question propounded in this case, counsel for plaintiff assumed the facts in accordance with his theory of what the evidence tended to prove. It was not essential that such facts should be undisputed. It was the province of the jury to determine whether they were actually proved. As was said by Folger, C. J., in the case of *Cowley v. The People, supra*, in discussing this question:

"The claim is that a hypothetical question may not be put to an expert unless it states the facts as they exist. It is manifest, if this is the rule, that in a trial where there is a dispute as to the facts, which can be settled only by the jury, there would be no room for a hypothetical question. The very meaning of the word is that it supposes, assumes something for the time being. Each side, in an issue of fact, has its theory of what is the true state of the facts, and assumes that it can prove it to be so to the satisfaction of the jury; and so assuming, shapes hypothetical questions to experts accordingly."

Without noticing in detail the testimony relied on as tending to establish the facts assumed in the question complained of, suffice it to say we find ample testimony in the record tending to support each and every phase of the question,

and sufficient to justify the submission of the same to the jury.

The cause of action set forth in the complaint is that plaintiff was afflicted with phimosis; that the prepuce or foreskin adhered to the head of the penis and caused a constriction or strangulation that prevented circulation and produced a swelling thereof; that by reason of negligence and unskillful and improper treatment by defendant, gangrene set in and destroyed the organ. Upon this theory the case was tried by the plaintiff, and in support thereof he offered testimony to show the condition of the penis at the time defendant had charge of the case. The defendant, by his answer, in effect denied that phimosis was the malady from which plaintiff suffered, and by his evidence sought to show that the predisposing cause of the swollen condition of the organ was an ulceration of the urinal canal; and that for such a case he used the proper treatment. Therefore, it became the important, if not the controlling question in the case, which of these respective theories was correct, since the propriety of defendant's treatment of plaintiff depends upon which was the correct diagnosis, and whether defendant exercised ordinary care and skill in examining the case, as well as in applying remedies. To determine this, resort must be had to the opinion of experts, based upon the ultimate facts as the jury may find them established by the weight of the evidence. Perceiving no error, therefore, in the admission of testimony, and it being the exclusive province of the jury to determine its probative force and the facts established thereby, we are precluded, on this review, from discussing the credibility of the witnesses or the weight of their testimony; nor are we at liberty to substitute our opinion for that of medical experts as to the proper mode of treatment, but must accept the verdict as conclusive of the correctness of plaintiff's theory that the malady from which he suffered was phimosis, and that the mode of treatment adopted by defendant was improper and injurious.

It only remains for us to determine whether the testimony

was submitted to the jury under instructions which correctly define the law applicable to the case. We think that the instructions, taken as a whole, correctly define the nature and extent of the obligation that a physician or surgeon assumes when he accepts employment in his professional capacity. They certainly embody the law on the subject as uniformly laid down by text writers and announced in the adjudicated cases. They state, in substance, that by holding himself out to the world as a physician and surgeon, he impliedly contracts that he possesses the reasonable degree of skill, learning and experience which good physicians and surgeons of ordinary ability and skill, practicing in similar localities, ordinarily possess ; that in judging of the proper degree of skill in any given case, regard is to be had to the advanced state of the profession at the time ; that he will use his skill with ordinary care and diligence according to the circumstances of the case, and is liable only for ordinary neglect ; that he does not undertake to warrant a cure, but only to exercise a reasonable amount of knowledge, skill and care in diagnosing the case and in applying the remedies ; and the jury are expressly told that if they should find that defendant brought to the treatment of plaintiff such ordinary degree of knowledge and such skill and judgment, the plaintiff could not recover.

We do not understand that counsel for defendant seriously controverts the correctness of the foregoing rules, but relies for a reversal of the judgment rather upon the refusal of the court to give certain specific instructions requested by him, and the giving of particular instructions asked by plaintiff, notably the refusal to give the following :

" If you believe that the defendant exercised his best judgment in diagnosing the plaintiff's case, and in applying remedies thereto, the plaintiff cannot recover, although you may believe that the defendant was mistaken as to the true character of the disease."

While it is true that physicians "are not responsible for the errors of an enlightened judgment where good judg-

ments may differ, * * * they will be charged with error, or should be, only where such errors could not have arisen except from want of reasonable skill and diligence" (Elwell on Malpractice, etc., pp. 29, 30) ; yet, as is said by Ewing, J., in discussing a like instruction in the case of *West v. Martin*, 31 Mo. 375, "whether errors of judgment will or will not make a surgeon liable in a given case depends not merely upon the fact that he may be ordinarily skillful as such, but whether he has treated the case skillfully, or has exercised in its treatment such reasonable skill and diligence as is ordinarily exercised in his profession."

If it be conceded, as counsel for defendant contends, that by the pleadings it is admitted that defendant possesses the requisite skill and judgment, the gravamen of this case being that he neglected to exercise ordinary care and diligence in his examination and in using such skill and judgment in the diagnosis of the case, as well as in applying remedies, the instruction is objectionable in that it exempts defendant from responsibility if he used his best judgment, notwithstanding he may have been inattentive or careless in his examination of the case, or whether the case was such that the proper mode of treatment was involved in doubt.

After a most thorough and careful examination of the record, and especially of the instructions passed upon by the court of appeals, we are unable to concur in the conclusion reached by that court; and while of the opinion that some of them are subject to criticism, we think, nevertheless, that when read in connection with the general charge, they cannot be held to constitute reversible error.

The first one in order and importance is number 5, and reads as follows :

"If you find from the evidence that this defendant, in the treatment of the plaintiff, omitted the ordinary or established mode of treatment, and pursued one that has proved injurious, it is of no consequence how much skill he may have; he has demonstrated a want of it in the treatment of the particular case, and is liable in damages."

As a general abstract proposition of law, this instruction may be subject to criticism. It is not always true that a physician, by failing to use the "ordinary or established mode of treatment," demonstrates a want of skill; but in a case involving doubt, or when there are reasonable grounds for a difference of opinion as to the nature of the disease and the proper mode of treatment, if a physician or surgeon possessing the requisite qualifications applies his best skill and judgment, with ordinary care and diligence, to the examination and treatment of a case, he is not responsible for an honest mistake or error of judgment as to the character of the disease or the best mode of treatment. *Patten v. Wiggin*, 51 Me. 594. But when read in view of the issue presented by the pleadings in this case, and in the light of the testimony introduced, we do not think the instruction could have misled the jury to the prejudice of defendant.

As above stated, the complaint alleges that plaintiff was suffering from phimosis, and that the ordinary method adopted by the profession in the treatment of such cases was to slit up the prepuce or foreskin ; that defendant wrongfully neglected to adopt this method and applied a different remedy, which aggravated the malady and accelerated gangrene, which caused a destruction of the member.

These allegations were denied by defendant, and upon this issue the jury were called to pass. We find abundant evidence in the record to the effect that the plaintiff was afflicted with phimosis, and that the ordinary and established practice of the profession was to treat that ailment in the manner alleged in the complaint; and in fact the defendant himself testified that such was the proper treatment of that malady. It therefore became a pertinent inquiry to be submitted to the jury whether the evidence showed an established mode of treatment in such a case, and if so, whether defendant adopted some other mode that proved injurious ; and if he did, it was immaterial how much skill he possessed, since his failure to use it constituted such negligence as would render him liable. As was said in the case of *Patten v. Wiggin*,

*supra :* " If the case is such that no physician of ordinary knowledge or skill would doubt or hesitate, and but one course of treatment would by such professional men be suggested, then any other course of treatment might be evidence of a want of ordinary knowledge or skill, or care and attention, or exercise of his best judgment, and a physician might be held liable, however high his former reputation."

In this connection, although out of its order, we notice instruction number 16, as it embodies somewhat the same principle, in the following language :

" That, if writers on the treatment of phimosis, or practical surgeons prescribe a mode of treatment, it is incumbent on surgeons called on to treat such an ailment to conform to the system of treatment thus established, and if they depart from it they do so at their peril."

The learned writer of the opinion of the court of appeals condemns this instruction because it contravenes the rule that the criterion by which to judge of the correctness of a particular mode of treatment must be one universally adopted by the profession, and that the language used in the instruction may be construed to mean that a treatment prescribed by *some* writers or *some* surgeons may not be departed from without peril; and for the further reason that, if sustained, the rule announced will prohibit further progress in surgery.

We do not think the language used should be construed, or that the jury could have understood it to mean, that a treatment laid down by *some* writers or practiced by *some* surgeons should control, but that it clearly conveys the idea that the mode of treatment meant is one which writers and the profession universally commend.

With this construction, the rule announced is correct. There must be some criterion by which to test the proper mode of treatment in a given case, and when a particular mode of treatment is upheld by a concensus of opinion among the members of the profession, it should be followed by the ordinary practitioner; and if a physician sees fit to experiment with some other mode, he should do so at his peril.

In other words, he must be able, in the case of deleterious results, to satisfy the jury that he had reason for the faith that was in him, and justify his experiment by some reasonable theory. As was said in the case of *Carpenter v. Blake*, 60 Barbour, 488 :

" Some standard, by which to determine the propriety of treatment, must be adopted ; otherwise experiment will take the place of skill, and the reckless experimentalist the place of the educated, experienced practitioner. If the case is a new one, the patient must trust to the skill and experience of the surgeon he calls ; so must he if the injury or the disease is attended with injury to other parts, or other diseases have developed themselves, for which there is no established mode of treatment. But when the case is one as to which a system of treatment has been followed for a long time, there should be no departure from it, unless the surgeon who does it is prepared to take the risk of establishing, by his success, the propriety and safety of his experiment.

" The rule protects the community against reckless experiments, while it admits the adoption of new remedies and modes of treatment only when their benefits have been demonstrated, or when, from the necessity of the case, the surgeon or physician must be left to the exercise of his own skill and experience."

And, furthermore, this instruction could not in any event be prejudicial to the rights of defendant, since the evidence before the jury concurred as to the proper treatment to be used in a case of phimosis, and there was therefore no contention as to different modes of treatment, should the jury find from the evidence that plaintiff suffered from that malady. And when we limit our investigation to the testimony upon which the case was submitted to the jury, as we must, we find no possible aspect of the case in which the instruction complained of could constitute prejudicial error.

The following instruction, number 8,—" If the jury find from the evidence that, through the negligence of the defendant, gangrene attacked the plaintiff and necessitated

the amputation of the organ, or if you find that gangrene had set in upon the first visit of the defendant, yet he neglected to take the proper and ordinary measures to prevent its progress, and thus necessitated amputation, or greater amputation than would otherwise have been necessary, he is liable in damages,"—was held to be error by the court of appeals because it assumed at the time Dr. Burnham was called, and during the time he was in attendance, gangrene had set in ; and further, because the record failed to disclose testimony satisfactorily establishing that fact, and it was a conclusion of the court wholly unwarranted by the evidence.

We are unable to concur in this view for either of the reasons stated. We cannot see wherein the instruction contains any assumption of fact, but we think it clearly leaves the finding of the facts to the jury. We furthermore find considerable testimony tending to establish the fact that gangrene had set in during the time at least that defendant was treating the case, and certainly much evidence that very strongly supports the conclusion that even if it had not set in on his first visit, that through his negligence gangrene attacked the plaintiff and necessitated the amputation. Upon this point the plaintiff testified, *inter alia :*

" When he (referring to defendant) was there Tuesday morning, he did not ask me to feel of the organ and tell what I felt; but then I was handling it. * * * This gas came out and bloodlike, and he saw that. * * * The head was perfectly black, and the skin part looked as though there was corruption under it, ready to break out; looked whitish all from the head back to a half inch or so from the body."

Peter Vass, a witness for plaintiff, testified on this point: " I had sole charge of making and putting on the poultices. I first detected any odor on Tuesday. * * * When I first noticed the odor, the head of the penis was very dark—not the natural color of the skin. * * * When I would touch it, it seemed as though it was dead; like you press your flesh down and it didn't stay there; there was no life."

P. D. Rothwell, a physician, testified : " Was called on the
8th, Wednesday night. * * * I examined the organ by tak-
ing it in my hand and pressing upon it, and determining the
nature as near as I could what constituted or made that
swelling.  I told him it was gangrenous, and I didn't wish
to have anything to do with the case."

William B. Craig testified : " I am a physician ; have
practiced since 1875 ; was called in consultation with Dr.
Rothwell in plaintiff's case Wednesday evening, between
eight and nine o'clock, January 8th ; found the penis in a
state of gangrene.  As far as I could judge from the history
of the case and condition of the organ, the gangrene was due
to phimosis. * * * The head was shrunken, mummified in
appearance.  Strangulation had taken place when I saw it.
* * * It was impossible to say just how long gangrene had
existed in the glands.  It had existed for some time.  I
should judge, from the extent of the gangrene, the whole
organ was more or less gangrenous.  It was my impression
then, and it is now, that the constriction was from congen-
ital phimosis—that was the predisposing cause. * * *

" Q. What other symptoms have you besides color to detect
gangrene ?  A. Why, the sensation transmitted to you by
the touch ; feeling of the tissues and cracking sensation in
the formation of the gas and the composition of the parts.
The swollen condition, and possibly the degree of the tem-
perature of the parts, determine gangrene from that source
as well. * * * From the condition of the person at my first
visit, my opinion was that there was a time when liberation
of this compression or constriction would have prevented
gangrene of the glands in the body."

William A. Rothwell testified : " At the first cut the skin
and tissue under the cut was alive, the center part entirely
dead. * * * It was all gangrenous up to the roots.  When
I went there it was very much swollen, and on pressure gas
came off and the smell was simply terrible."

John Boice testified : " I am a surgeon. * * * Made it a
specialty for twelve years ; was called in consultation with

Dr. Craig and Dr. Rothwell to the plaintiff about 8th of January last; think I saw him on the 9th with Dr. Rothwell; Dr. Craig was not present. I found the penis very much swollen with the prepuce slit up to the corona and the glands in a sloughing condition."

The defendant himself testified : " I examined the organ as far as I could, but I found it in a filthy condition. Not only in appearance, but in odor it was filthy. It was practically what I would term stinking."

On cross-examination : "Q. You saw no symptoms of gangrene ?   A. I saw, sir, a condition that led me to fear.

"Q. Gangrene ?   A. Yes, sir.

"Q. What are the different kinds of gangrene, doctor ? A. Well, there is dry gangrene and there is moist gangrene. In this case it was moist gangrene, I should judge, from the symptoms I've heard. * * *

"Q. Doctor, did you know that gangrene had set in at the last time you were there ?   A. Not positively, sir.

"Q. If you did not know this, why did you prescribe the disinfectant, such as charcoal?   A. Well, sir, because I feared—

"Q. You feared there was?   A. I feared there might be, sir."

Other testimony to the same effect appears in the record, but we have cited this much to show that there was evidence sufficient to justify giving this instruction. Whether it satisfactorily established the fact that gangrene had set in while Dr. Burnham was attending the case, or resulted through his negligence, was for the jury to determine, and the question we think was properly submitted to them by this instruction.

The objection urged, and sustained by the court of appeals, to instruction number 15, is of more serious import. This instruction is as follows :

" That it is important to the interests of society that the profession intrusted with the preservation of the health and

lives of the community should be held to a strict rule of accountability."

This is not the affirmance of any legal proposition, but is true only as a statement of a moral obligation that rests upon one who assumes to exercise the function of a profession that deals with the important matter of life and death; and, as well said by the learned writer of the opinion of the court of appeals, " that it is referring to matters which should not have been called to the attention of the jury." But, notwithstanding this, unless it may be held to have in some way prejudiced the minds of the jury against defendant, it does not constitute reversible error. That it could not have had that effect when construed in connection with the other instructions, wherein the court had repeatedly advised the jury as to the measure of defendant's duties and obligations, we think is evident. They had been told, both in the instructions asked by plaintiff and those given on the part of defendant, that the defendant, in the treatment of the case, was required to exercise only ordinary care and skill, and that he could be held liable only for ordinary neglect. The expression, therefore, that physicians " should be held to a strict rule of accountability," in the light of all the instructions, must have been regarded by the jury in the sense that it was originally used in the opinion from which it was copied; and that is, that a compliance on their part with their legal obligation should be strictly enforced. It has been frequently held that only prejudicial error constitutes a ground for reversal; and if the court can see that upon the whole testimony of the case, and under the governing principles of law, the result reached in the trial of the cause is a just one, the judgment must be upheld. *Schoolfield v. Houle*, 13 Colo. 394.

Our conclusion is that the record in this case does not disclose any error prejudicial to the rights of defendant. The judgment of the court of appeals is accordingly reversed, and the cause remanded to that court with instructions to affirm the judgment of the district court.

*Reversed.*