ROBERT J. KELLEY v. DIANA RICHARDSON.

[See *ante*, 400.]

*Expert testimony—Opinions of witnesses—Attorney and client.*

1. The phrase "expert testimony" is not entirely fortunate as designed to cover all cases where a witness may give his opinion, which is done, in a multitude of cases, by witnesses who have no more personal fitness than any one else, but who have been so placed as to have seen or heard things which can only be described to any one else by giving the impressions produced on the mind or senses of the witness.

2. The word "experts" means only the acquisition of certain habits of judgment, based on experience or special observation; and the scale rises as the qualifications become nicer, and require greater capacity or knowledge and experience, until it reaches scientific observers, and practitioners in arts and sciences requiring peculiar and thorough special training.

3. In several of the grades or kinds of what may be classed as expert testimony, there may be witnesses whose testimony is only received in regard to their conclusions based on their own observation of facts relating to the cause at issue, and others who can lawfully give conclusions on facts described by others. So there may be cases where a safe opinion may be drawn from a few leading facts, and others where the variation of a single fact—as in a chemical mixture—changes the entire result.

4. The value of services can never be a question of science, but is one depending chiefly on usage and experience.

5. It is only by cross-examination that the *value* of anybody's opinion on any subject can be thoroughly tested.

6. It is generally, if not universally, customary, for lawyers, employed to see to the proving of wills or granting administration, to attend, either personally or by proper direction to others, to all the steps in the proceedings, as they would in a civil action.

7. Where a lawyer, in a given case, performs, as he often does, the combined functions of attorney and counsel, he at least *oversees* everything; but where he acts merely as counsel, some other lawyer may look after the attorney's duties of detail; but they are all *professional* services.

8. When a lawyer is employed professionally to take entire charge of matters involving at the same time professional services, and services which are not so strictly special that others than lawyers might not perform them, it is impossible to draw any line, and say that he is not employed professionally throughout.

9. Where an attorney performs distinct services for a party without any *general* employment, there is some reason for saying that for each of these detached services he should charge a separate price, and, in case of dispute, prove its separate value; but any such practice in regard to a *general* employment would be unreasonable and impracticable.

Error to Alpena. (Emerick, J.) Argued November 8, 1887, and reargued February 28, 1888. Decided April 20, 1888.

*Assumpsit.* Defendant brings error. Affirmed. The facts are stated in the opinion.

*D. C. Holbrook,* for appellant.

*R. J. Kelley,* in *pro. per.,* for plaintiff.

CAMPBELL, J. This case was first argued at the October term of 1887 before three Judges. But as a case involving the same questions was, early in the January term, 1888, argued before the full bench, it was thought proper to have the present case presented so as to be decided by the same Judges. It was therefore reargued, with some additional arguments and submitted for our final action.

Plaintiff recovered judgment below against defendant for $20,000 for services rendered her as executrix and sole legatee and devisee of her husband's estate. These services were sought from him as an experienced attorney, solicitor, and counselor. The proof of value was chiefly given, on both sides, by members of the legal profession; and the only questions presented by this present record relate to the competency of their testimony as embracing opinion. On the reargument the dispute was entirely narrowed down to this. It will not be necessary, therefore, to set out at length the slightly-varied questions on which each of the several witnesses was examined. With an outline of the controversy to explain it, the precise questions of law can be put in shape without much repetition.

Charles W. Richardson, who died in June, 1886, was an extensive dealer in lumber products in Alpena county, having large tracts of pine, mills, and much personal property and securities; all aggregating about $1,000,000 and over. When he died, the business was in full operation. Nearly 30 years before his death, while living in Maine, and doing business in Canada and New England, he made a will giving everything to his wife. Many years ago, he came to Michigan; and most of the property, real and personal, which he left behind him, had been acquired during his residence here. He never had children, but had collateral heirs.

After his death, defendant had his will presented for probate. Meanwhile the business was continued as usual. The heirs at law threatened and made preparation to oppose the

probate of the will, and defendant understood it.   She, in the beginning, employed plaintiff to aid her in all her business, and in the expected contest.   The will was admitted to probate.   The contest was compromised by a payment of $120,000 to the heirs.   Defendant refused to pay plaintiff for his services, and he sued her, and recovered, as before stated. She brings error.

A good many witnesses appear to have been sworn on both sides.   The only witnesses sworn for plaintiff, whose testimony appears, were Messrs. Dickinson, Russell, Baker, Atkinson, and Griffin, of the Detroit bar, and Mr. Sleator, of Alpena, who had been associated with plaintiff in some of his services.   Except Mr. Sleator, all these witnesses testified by deposition taken before the trial.   Other witnesses, not named, also testified.

Defendant examined several gentlemen from Detroit and Saginaw and elsewhere, and they also gave depositions.

The errors assigned all relate to the competency of direct questions and answers in plaintiff's depositions, and cross-interrogatories and answers from defendant's depositions. No more is given of any of these depositions than the questions and answers directly aimed at.   No other testimony in the case is set out, but it is stated that all the facts on which hypothetical questions were put to the witnesses for their answers were proved on the trial.

The record does not intimate that any objection was made that any of plaintiff's witnesses were incompetent personally for lack of knowledge on any of the topics presented.   The objection made was that the questions touched upon matters not within the province of expert evidence, and the reason why this was claimed was that business management was involved, outside of regular legal services.   The witnesses all showed a familiarity with such legal assistance as is required in the management of large lumbering properties, and most of them disclaimed personal experience in actually running

69 MICH.—28.

lumber business individually. But, on the argument, defendant's counsel claimed some of the questions involved that sort of personal experience.

The testimony shows that plaintiff's services did not include his personal management of the details of the mill and lumber business, but only his continuous advice and oversight of all the concerns of the estate, aside from personal interference in the details. This is expressed in the following explanation:

"This case was tried upon the sole theory that the plaintiff was entitled to recover what was fair and reasonable for professional services rendered under the circumstances of the case, and the only contest made by the defendant was that the amount of compensation claimed was excessive."

The only question before us is whether the testimony of these various gentlemen contains such elements that they could show the value of plaintiff's services by their opinions. As before stated, the bill of exceptions shows affirmatively that the facts set out in the hypothetical questions were proved.

As the assignments of error recite *verbatim* the questions and answers, and their circumstances, so far as necessary to explain the law points, they will not be recited here, but an analysis will be given of the disputed matters, covering all that was relied on as error.

The questions described the date and circumstances of the will, and the situation and age of the husband and wife, as well as the subsequent acquisitions of property, and the extent and kind of the property, and situation of the business and its character, and the existence and number of the heirs at law. It was then stated that defendant, after her husband's death, employed plaintiff to take charge, advise and counsel defendant in the probating of the will, and the management of the estate, until it was closed up; that plaintiff prepared and filed the papers, and attended to the probate, and procured the appointment of defendant as special admin-

istratrix pending the litigation, and himself caused and superintended the inventorying of the whole of the estate. After the petition was filed, a contest was made, supposed to be in good faith, on behalf of the heirs at law, 12 in number, to attack the legal validity of the will. The will was probated, and contestants prepared an appeal. A few days before the time for completing the appeal proceedings ran out, defendant compromised for $120,000. Before and after the compromise, plaintiff advised defendant in regard to all her affairs and business, being called to see her at her house three or four times a day during the whole period; and all his time was occupied by her affairs, for about five months. During this period, the whole estate was realized substantially in cash or its equivalent, and the estate closed up completely. Plaintiff had prepared himself to meet all questions arising or likely to arise in the expected litigation, and concerning the management and disposition of the estate and business, and kept defendant advised on all subjects.

The witnesses were examined on these hypotheses; some on the separate services before and during the probate, and the remainder as separate basis of charge, and some upon the entire body of services from the beginning to the end. All of them, whether putting them in one or two classes, gave an aggregate value beyond what was recovered.

The defendant's witnesses, who gave lower estimates upon a different theory, and some of whom professed inability to give opinions on some parts of the services, were asked, on cross-examination, questions involving the business, advice, and management, and raised their estimates considerably. These questions and answers were objected to by defendant.

A part of plaintiff's witnesses referred to the infrequency of such large estates in this region, and the difficulty of finding a standard from precise analogies. One referred to the fact that in New York such cases were common; but he tes-

tified that his estimates were not based on the standard of
compensation in New York, which he said was much larger,
and that he acted on his understanding of business and com-
pensation here.

The course which the argument took makes it necessary to
consider with some care the subject of testimony of values of
services, and on what theory it is admitted. Much of the
confusion arose from confounding things essentially different.
But the principles are all elementary, and the difficulty, where
there is any, is merely one of application.

The phrase "expert testimony" is not entirely fortunate
as designed to cover all cases where a witness may give his
opinions. That is done, in a multitude of cases, by wit-
nesses who have no more personal fitness than any one else,
but who have been so placed as to have seen or heard things
which can only be described to any one else by giving the
impression produced on the mind or senses of the witness.
These cases are so common that few persons ever think that
what are rightly called facts are at the same time no more
nor less than conclusions. Thus, impressions of cold or heat,
light and darkness, size, shape, distance, speed, and many
personal qualities, physical and mental, are constantly acted
on as facts, although not uniformly judged by all observers,
for the simple reason that the facts cannot be otherwise com-
municated. Any person can give such impressions without
special experience or special intelligence.

Beyond these every-day matters, known to all men, are
things which most, if not all, persons can become qualified to
judge by more or less opportunities of observation, local or
habitual, but which require no peculiar intelligence. Then
there are branches of business or occupations where some
intelligence is requisite for judgment, but opportunities and
habits of observation must be combined with some practical
experience. This seems to be the beginning or lower grade
of what may be properly termed "experts;" a word meaning

only the acquisition of certain habits of judgment, based on experience or special observation. And the scale rises as the qualifications become nicer, and require greater capacity or knowledge and experience, until it reaches scientific observers, and practitioners in arts and sciences requiring peculiar and thorough special training. In several of the grades or kinds of what may be classed as expert testimony, there may be witnesses whose testimony is only received in regard to their conclusions based on their own observation of facts relating to the cause at issue, and others who can lawfully give conclusions on facts described by others. So there may be cases where a safe opinion may be drawn from a few leading facts, and others where the variation of a single fact—as in a chemical mixture—changes the entire result.

The objection taken below, that the questions put to the witnesses concerning the value of plaintiff's services included matters not belonging to expert testimony, seems to have been based on the notion that testimony concerning legal services is scientific, and only open to lawyers, while testimony relating to business services has no scientific basis, and is not expert testimony for that reason. But there is no foundation for any such distinction. The value of services can never be a question of science. It is one depending chiefly on usage and experience. It is quite possible, and probably not very uncommon, for a person who is not a lawyer, or who is not one of high professional ability himself, to understand the proper rates of charges for legal services. There are lawyers' clerks, never admitted to the bar, who are quite as well informed on such subjects as their employers. Presumptively, lawyers are able to testify on such matters; but, when they are, their knowledge has not come from law books, but from law business. The best lawyer at the bar, going out of practice for a few years, or changing his location, may be quite incompetent to form a correct opinion. The same is true in regard to any other business. Presumptively,

those engaged in it are informed generally. But when any business is done on a large scale, and there is a fixed subdivision of labors and duties, financial and what is commonly called business knowledge is not always found even in foremen of departments, and a knowledge of the value of articles or services, and of the general course or outcome, may be and generally is in persons who, as employers or business agents, have their attention called to those subjects.

I am not myself prepared to say that a lawyer who has had experience as the general adviser of lumbering establishments carried on upon a large scale may not be properly asked concerning the value of services in its general business management. It would be difficult for an intelligent lawyer to act as general adviser without informing himself with some care on all such matters; and it would certainly be possible for him to have accurate knowledge, reaching much further than general management. Here, as elsewhere, we know that business men, where large interests are at stake, depend very much on legal advice, and expect their counsel to be able to advise them. A railway lawyer not generally familiar with all manner of railway questions, or a bank lawyer ignorant of commercial usages, would be of very little use to his employers.

The safe test in all such cases is by cross-examination. It is only by that process that the value of anybody's opinion on any subject can be thoroughly tested. In this, as in most cases, the witnesses differed in their estimates, and the jury seem to have been able to form an opinion as to their relative importance as witnesses. The same difference might arise as to the value and qualities of a horse, or of a house, or land, or machinery; and the difference is always settled by weighing the apparent intelligence or experience or observing faculties of the witnesses. A witness cannot be excluded if he has had means of knowledge, and claims to have formed an opinion. The worth of that opinion is another thing.

These witnesses were all cross-examined, and they gave in their direct as well as cross-examination the grounds of their conclusions. The jury did not accept any of them as conclusive, and scaled them down, in the light of the other testimony, as much as they thought proper.

But, as a matter of fact, it appears very clearly from the record that none of these witnesses testified to anything but what they regarded as legitimate work for a professional adviser. It would be stretching the assignments of error a good deal to hold them as raising distinctly the question whether the services rendered were extraprofessional. But the case is not one where we are inclined to be over nice in construing objections, and we will consider the questions argued upon this subject.

It cannot be doubted that all of the services rendered in regard to the probate and establishment of the will were within the ordinary range of legal business. It is generally, if not universally, customary for lawyers, employed to see to the proving of wills or granting administration, to attend, either personally or by proper direction to others, to all the steps in the proceeding, as they would in a civil action. Where a lawyer, in a given case, performs, as he often does, the combined functions of attorney and counsel, he at least oversees everything. Where he acts merely as counsel, some other lawyer may look after the attorney's duties of detail. But they are all professional services, if performed. The same remarks apply to the special administration.

We can see no reason why advice and direction concerning the completion of the inventory stand on any different footing, or why anything connected with the winding up of the estate can be treated as beyond the line of professional advice. The compromise is certainly within the rule. It must, as a compromise, be regarded as a settlement of a legal dispute, which in this case was the validity and effect of a contested will. The dispute, so far as we can judge, must have been

one chiefly, if not entirely, of law.　It certainly involved legal principles of importance, which have a different application under some statutes than at the common law.　We have no means of knowing what the compromise was based on; but such compromises are seldom made without consulting counsel, and such consultation is certainly professional, whatever considerations may prevail.

The theory of the rest of the inquiry was that defendant constantly sought, by frequent consultations, daily and several times a day, advice from plaintiff concerning the entire management of the business, and the winding up of the estate, by converting the entirety, both business and property, into available assets, and that by the aid of this advice the whole matter was so closed up in about five months, without litigation or hinderance.　This is certainly a very remarkable showing, and it cannot be doubted that advice which aided in realizing everything in so short a time was extremely profitable to defendant, and had a substantial money value, if given under employment.

The testimony on which opinions of value were asked further showed, as a basis of inquiry, this general state of things, including what has been already referred to:　The employment of plaintiff was applied for at once after Mr. Richardson's death, and required him to be always ready to devote his whole time, if necessary,—and it turned out to be necessary,—to assuming charge of the establishment of the will against any contest, the completion of all the probate business, the advisory direction of all the business, and the realization and closing up of the matters of the estate, whatever they might be; and all these services were rendered.　The union of all this employment could only be and actually was made because of defendant's legal standing, and it included a series of transactions concerning all of which legal advice is very generally sought.　The question really is whether, where a lawyer is employed, because he is a lawyer, to perform a

complete body of services, all appropriate for some legal advice, but some perhaps involving advice both legal and what might in part be given by others than lawyers, the fact that some of it may have been of a mixed character makes the services, to that extent, beyond the range of professional services, and beyond the range of knowledge of lawyers to testify as to their value.

It seems to us that when a lawyer is employed professionally to take entire charge of matters involving at the same time professional services, and services which are not so strictly special that others than lawyers might not perform them, it is impossible to draw any line, and say that he is not employed professionally throughout. Where it is understood on both sides that such employment is based on professional character and ability, it would be impossible for any one to pick out items which can be discriminated, unless the services throughout are to be shown by items and paid accordingly. That, although not very plainly defined in the assignment of errors, is suggested as the proper method of charging, and fault is found with these questions because they do not contain the separate statement of the multitudinous items of work actually done.

This is perhaps plausible, but it will not bear investigation.

If Mrs. Richardson had come to Judge Kelley now and then, or ever so frequently, without any general employment, and asked him to-day to draw a petition or a deed or an affidavit, or to go into court and argue a single case, and no more, there would be some reason for saying that for each of these detached services he should charge a separate price, and, in case of dispute, prove its separate value. But any such practice in regard to a general employment would be unreasonable and impracticable, and would be just as much so in every-day affairs as in legal affairs. If a lawyer is employed to draw a declaration on a case submitted to him, he does something more than prepare so many folios of a document,

which may be in print chiefly, and cost him no manual labor and no mental labor. The employment means that he becomes professionally informed concerning private affairs of his client, which he has no right to reveal, and that he has formed, perhaps on long study, an opinion concerning the right of his client, and the best remedy to enforce it. It means, further, that he debars himself from employment by any other person concerning the matters in controversy. Any standard of reward which leaves out any of these considerations would be wrong, and operate as a fraud on him, if his client should, after getting all these advantages, discharge him. It would be no answer to a claim for services under an employment for a year or for a voyage to say that no services were asked, and none were rendered, if the person employed was ready to perform them. Such an employment as Judge Kelley received in this case, on the theory laid before the witnesses, compelled him to debar himself from receiving employment from anybody but defendant, not only in regard to the will, but in regard to any of the property or business. It required him to prepare himself to be ready at all times to meet any legal question that might arise concerning the interests of the estate, to be always ready to answer requests for advice, and to give it without request if occasion required, to be prepared for and to conduct any litigation in any stage of its progress, and to do no business which would stand in the way of continued readiness to look after defendant's interests. It actually occupied all his time till the estate was closed, and would have done so had it taken longer. It would not only be impracticable, but it would be utterly wrong, to attempt to measure such an employment by the aggregation of the single acts done at what might be supposed to have been their separate values.

The only possible test of value is that of the employment taken together, or, at most, separated merely by the services touching the will and the remainder. There was testimony,

on both of these theories, on each side of the case. The value was shown by the only accessible means, and all of the considerations on which the witnesses based their views were not only appropriate, but properly aggregated. There can be no precise standard in such a case, where no sum has been agreed upon. In the conflict of opinions, the jury must settle the matter according to their estimate of the good judgment and fairness of the witnesses. We cannot take their place, and review their finding. It was considerably within the estimate of plaintiff's witnesses so far as appearing on the record, and above that of defendant's witnesses found there. We are not informed, and it does not concern us, how the other witnesses testified or averaged. It is quite evident that the jury exercised their judgment in coming to a conclusion, and it is not claimed they were not rightly instructed, if they had testimony to act upon.

We have considered the questions in all the bearings which we deem to have been properly presented on the argument, and think the judgment is not erroneous, and should be affirmed.

CHAMPLIN and LONG, JJ., concurred with CAMPBELL, J.

SHERWOOD, C. J. I cannot concur in the opinion filed by my Brother CAMPBELL in this case.

The plaintiff brings his suit in *assumpsit* against the defendant, for professional services rendered as an attorney and counselor at law in the probate court in securing probate of the will of her late husband, Charles W. Richardson, deceased, and in settling his estate under the will, which gave her all the property, amounting to about $1,000,000.

The declaration consists of two special counts, with the common counts added. The defendant pleaded the general issue.

The cause was tried in the Alpena circuit, in June last, before his honor, Judge Emerick, with a jury, and the plaint-

iff recovered a judgment for the sum of $20,000. The defendant brings error. The record contains a bill of exceptions, presenting such only of the testimony as the court deemed necessary to properly raise the questions made upon the evidence. The charge of the court is not given in the record.

Seventeen errors are assigned upon the admission of the testimony, and all were argued at the hearing. Seven witnesses, including the plaintiff, were examined on the part of the plaintiff. Five of them were from Detroit, and two from Alpena. Sixteen witnesses from Saginaw and Detroit were sworn and examined on the part of the defendant. The witnesses on both sides were all able and distinguished members of the Bar of Michigan.

The plaintiff's main reliance in making out his case was the expert testimony given by his professional witnesses as attorneys and counselors at law; and all the defendant's exceptions relate to the rulings of the court made upon the objections taken to the hypothetical questions put to the witnesses upon the subject of value of plaintiff's services.

It appears from the undisputed testimony (and which is brief as stated in the record) that the husband of Mrs. Richardson was worth, at the time of his death, in property of various kinds, about $1,000,000; that, at the time of his death, he resided at Alpena, and by his will, made about 29 years before he died, he left all of his property to his widow, now about 62 years of age; that he left, as his heirs, twelve brothers and sisters,—six of the half blood, and six of the full blood; that these twelve children, acting by one of their number, a brother,—threatened to contest the validity of the will, and, when probate proceedings were had, the brother was present by counsel, and cross-examined the proponent's witnesses offered to prove the will, and filed the objection that the instrument propounded was not the last

will of Mr. Richardson. No charge was made of incompetency of the testator, nor of undue influence; and, without further contest, the will was admitted to probate.

That, after probate, the heirs threatened to appeal, and gave notice thereof, with the reasons for the appeal, but without perfecting the appeal; and, before the time had expired for so doing, a settlement was had between the widow and the heirs, by her giving them the sum of $120,000, and the probate of the will was allowed to stand.

That, pending the proceedings in the probate court, the widow was appointed special administratrix, and an inventory of the property was made and filed, and from which it appears that the estate of the deceased included a lumber plant and saw-mill in the county of Alpena, of the value of about a half million dollars, at the time in full operation, and the remainder of the estate consisted of stocks, notes, and accounts, secured and unsecured, amounting to about $200,-000, and the balance was real estate, vessel property, and money.

It further appears that the greater portion of the estate was converted into money, or its equivalent, including the mill plant and real estate, the latter of which consisted of valuable pine and other lands; that the plaintiff was retained by the defendant, within six days after the death of her husband, as chief counsel to aid her in obtaining probate of the will, and securing to her the estate and settlement thereof.

It also appears that the defendant had further employed to assist her in the case, besides the plaintiff, three counsel, Mr. Turnbull, Mr. Dafoe, and Mr. Sleator, all learned and distinguished counsel residing at Alpena, but that the plaintiff was relied on by her principally for counsel and advice, and which occupied most of his time from his employment during a period of five months thereafter. No complaint is

made by the defendant of the character of his services, or of his counsel, during the time of his employment.

It is further stated, at the close of the testimony in the bill of exceptions, that—

"This case was tried upon the sole theory that the plaintiff was entitled to recover what was fair and reasonable for professional services rendered under the circumstances of the case, and the only contest made by the defendant was that the amount of compensation claimed was excessive."

The amount claimed in the plaintiff's declaration was $50,000. Of course, the statement above could have no effect other than to limit the investigation to strictly professional services, and the consideration of their value, rendered by the plaintiff for the defendant growing out of the relation of attorney, counsel, and solicitor for her while he was engaged in the business for which he was retained; but such would undoubtedly be the case if the statement had not appeared in the record. The case involves the reasonable value of Judge Kelley's professional services as a lawyer, rendered to Mrs. Richardson on the probate of the will of her late husband, and thereafter, during the first five months, in the progress of the administration and settlement of the estate.

The case the plaintiff presented to the jury was one in which, to support his claim, it was entirely proper for him to resort to the expert testimony of good lawyers; the general rule being that, when the subject queried after so far partakes of the nature of a science or trade, or business or art, as to require a previous course of study, or habit or discipline, in order to the attainment of knowledge of it, opinions of such witnesses are admissible in proof of the service claimed for, and of its value. *Folkes v. Chadd,* 3 Doug. (K. B.) 157; Strick. Ev. 408; Best, Ev. §§ 511, 512, 514; 1 Starkie, Ev. 154; 1 Greenl. Ev. § 440; *Carter v. Boehm,* 1 Smith, Lead. Cas. *550, and note; *Rex v. Searle,* 1 Moody & R. 75; *Thorn-*

*ton v. Assurance Co.,* Peake, 25 ; *Chaurand v. Angerstein,* Id. 44 ; *Erickson v. Smith,* 2 Abb. Dec. 64 ; *People v. Lake,* 12 N. Y. 358 ; *Guiterman v. Steam-ship Co.,* 83 Id. 358 ; *Transportation Line v. Hope,* 95 U. S. 297 ; *Price v. Powell,* 3 Comst. 332 ; *Harnett v. Garvey,* 66 N. Y. 641 ; *Williams v. Brown,* 28 Ohio St. 547 ; *White v. Bailey,* 10 Mich. 155 ; *Covey v. Campbell,* 52 Ind. 157 ; *Allis v. Day,* 14 Minn. 516 ; *Jevne v. Osgood,* 57 Ill. 340 ; *Railroad Co. v. Nichols,* 24 Kan. 243 ; *Halaska v. Cotzhausen,* 52 Wis. 624 (9 N. W. Rep. 401) ; *Blizzard v. Applegate,* 61 Ind. 368 ; *Railroad Co. v. Allbritton,* 38 Miss. 242 ; *Anthony v. Stinson,* 4 Kan. 211 ; *Head v. Hargrave,* 14 Cent. Law J. 388 ; *Clussman v. Merkle,* 3 Bosw. 402 ; *Beekman v. Platner,* 15 Barb. 550 ; Rogers, Exp. Test. § 159 ; *Beaubien v. Cicotte,* 12 Mich. 501 ; *University v. Parkinson,* 14 Kan. 159 ; *Reynolds v. Robinson,* 64 N. Y. 589.

The following question was put by the plaintiff, a lawyer of unquestioned ability, to his witness, Don M. Dickinson, who practices in Detroit. The question is numbered one in the record :

"Now, on the eighteenth day of June last, Charles W. Richardson, of Alpena county, died, leaving an estate consisting of a lumber and saw-mill business, worth about half a million of dollars, in actual operation. He also left an estate in notes and mortgages and other securities of perhaps $200,-000. Real estate, with the other portions of the estate, would aggregate in total about one million of dollars. His business was in actual movement, in actual operation, at the time of his death.

"On the twenty-fourth day of June, his widow, Diana Richardson, the defendant in this case, secured my services to take charge of, advise, and counsel her in the probating of the will that was left, and the management of the estate until it was closed up. Under that arrangement, I procured for her the appointment of special administratrix to continue the business pending the probate of the will ; caused, actually superintended, the making of an inventory and appraisal of the whole estate, and filed the necessary petition, and attended the probating and proving the will. After the filing

of the petition for the probate of the will, a contest was made by 12 heirs, represented by one George Richardson, who had power of attorney for all the heirs to act. This contest was supposed to be, and was to all purposes, in good faith. One of the issues was that it was not the last will and testament of Charles W. Richardson. There was no charge of undue influence or incompetency, or anything of that sort, but that it was not his last will. I acted as her personal counsel in everything, as to her business; advised her as to her business, the course she should take; and had her appointed special administratrix of that estate.

"Under the circumstances, the magnitude of the estate, the character of the property, and the nature of the employment, what would you say would be a fair and reasonable retainer?"

To this question, and the answer made to it, counsel for the defendant objected,—

"For the reason that the witness was not an expert, and it involves advice and counsel to the defendant in the probate of the will, and the actual management of the estate until it was closed up.    *    *    *    In addition, he is called upon to give his opinion as to the management, and advice as to the management of property."

The witness made the following answer:

"I should take into consideration, Mr. Kelley, that you were one of the leading counsel in your part of the State; that a well-known counsel would be likely to be retained on one side or the other of the case. I suppose that I may assume that would be so in any case in that part of the State, from what I know outside of your question. I think the responsibility involved in actually managing an estate of that kind, advising as to the steps to take, the responsibility of counsel in your position, investigating the matter, determining what was to be done with the estate, left as it was by the death of the husband, taking the care and responsibility of advising as to the contest, investigating the matter prior to the contest, keeping yourself out of a possible contest on the other side, I should say that $5,000 would be a fair and reasonable retainer, as such, at the outset."

The objection of defendant's counsel was overruled, and an exception taken.

Counsel for plaintiff then asked the witness the following question:

"Now, after the probating of the will, on the twenty-sixth day of July, and from that time until the twenty-second day of November; where Mrs. Richardson, the defendant, required that I should advise her in all matters of her business, and the managing and settling up of her estate, so as to convert it into money, and where I did, and, in doing the work, spent practically the whole of my time; where, for the purposes of consultation, she required me to go to her house, and make her some 350 visits at her request and at her call, and succeeded in closing up the estate, so that she converted it into money, or the principal part of it, the whole time covering about a period of five months. I conducted the contest referred to, and the case through the probate court; investigated all questions of law and fact.

"The will bequeathed this entire estate to this old lady, some 61 or 62 years old. This will had been made by the deceased some 29 years before his death; was executed in Canada, although the deceased was domiciled at that time in the state of Maine. The property that constituted the estate was all acquired after the making of the will. All the legal phases of the contest, and the probable questions that might be raised against the will, were carefully examined, authorities consulted, and full briefs made; I remaining all this time as counsel in chief. What would you say would be a fair and reasonable charge, in addition to that retainer, taking into consideration the preparation for the contest?"

The witness made the following answer:

"You cannot adjust the rate of compensation in a case of this magnitude, involving so large an amount, by the ordinary rates charged in the common run of litigation and professional business in the State of Michigan. The only place where I know that such business may be considered as anything like common occurrence, or where there would be any precedents for regulating charges in such a case, is in the city of New York, where great estates are handled frequently. Such a case as this occurs only once in a generation—hardly more than this—in the provinces outside the city of New York. In giving my answer, I should not be governed by the charges made for time, aid, and services in the ordinary run of litigation. It is an extraordinary case. The responsibilities are extraordinary. The fact that the client is a

widow, presumably unfamiliar with business, should be taken into consideration, so that the responsibility would be largely devolved upon the counsel in chief, both for the management of the estate and for determining the questions that might arise upon the proposed contest, or questions that might arise upon the course of conduct of the client.

" I think that you would be entitled to make a charge for your services as counsel, and for conducting the estate, for which ability and time were required, for which an administrator familiar with business might ordinarily charge; and also for your time and responsibility as counsel, and examination in the matter of contest, which, of course, was a matter of great importance in an estate of that magnitude. I should say that the charge for conducting the estate to the close, and taking into consideration the dual nature of the services you rendered, and stating that, if guided by what I know of charges in the city of New York, where the management of such estates is very frequent; and if guided by which my estimate would be much larger, I should say fifteen or twenty thousand dollars, in addition to the retainer."

Thereupon the defendant moved to strike out the last question, and the answer thereto, for the reason that it was not expert testimony, and incompetent. The motion was overruled, and the defendant excepted. Subsequently the witness further stated:

" My estimate is based upon the hypothetical question. I know nothing of the facts, except as I have been informed in the hypothetical question."

The expert testimony was all taken by depositions. The plaintiff was also allowed to read from the depositions the following question put to witness Alfred Russell, who practiced in Detroit:

"On the eighteenth of June last [1886], Charles W. Richardson, of Alpena, died, leaving an estate, consisting of a lumbering operation and mill plant, of the value of about half a million dollars. He also left a personal estate, accounts, claims, notes, and unsecured claims of about $200,000; other securities and real estate,—aggregating in all about one million of dollars. The estate was devised to his widow, an old lady, 61 years old and upwards, by a will made 29 years

prior to his death. On the twenty-fourth day of June, his widow, Mrs. Richardson, the defendant in this case, employed me as her chief counsel in obtaining the probate of the will, proving and establishing the will, counseling and advising her through the management of the closing up of her estate. What would you say would be a fair and reasonable retainer to charge, taking into consideration all the circumstances?"

Defendant objected to the question as not relating to expert testimony, and as incompetent. The objection was overruled, and defendant excepted. The witness answered:

"I understand the word 'retainer' in its technical sense in this question as having reference to securing the services of an attorney as the main object, so that his services would not be availed of by the opposing parties. I understand that, according to the usage of the bar in this State, the amount of the retainer, under such circumstances, depends upon a variety of considerations. It depends upon the amount involved in the controversy; it depends upon the condition of life and experience of the client; it depends upon the responsibility cast upon the counsel retained; it depends upon the age and experience of the counsel engaged; it depends upon the likelihood of his being sought for by the other side; it depends also upon the question whether or not he is expected to render actual services, and be engaged in actual employment, in addition to his being retained.

"Now, with this preliminary statement of what I understand the usage to be, and custom of the profession in such cases, I say that, in the case now presented to me for my opinion and judgment, I take into consideration, first, what I understand to be a fact, that you were the oldest, or one of the oldest, or longest in practice, of lawyers in Alpena; I understand that your position was such that you would be likely to be sought for on the other side; I understand that your client was a widow, without experience, and apprehensive of a contest on the part of blood relatives of her husband; I understand that you were to be retained in view of the contest which was feared, and for the purpose of making preparations which would lead to success in the contest that took place.

"I should say, under the circumstances, in view of the great responsibility falling upon you, in view of the amount of property, and those circumstances that I have indicated, that the sum of $20,000 would be a reasonable retainer."

The defendant moved to strike out this answer, on the ground that the statements are given in the answer, instead of being in the question, and as immaterial, which motion was denied, and exception taken.

The following question was then read to the witness by the plaintiff:

"Now, in connection with such an estate as I have described, consisting of the class of property I have described, and magnitude; where, upon the filing of the will for probate, 12 heirs assail it, and institute a contest; where the attorney is required to make every preparation to meet such a contest, to examine all the legal phases of the case that may arise, and does actually, prior to the hearing in the probate court, make as full an examination as he can anticipate, both upon the law and the facts; and after sustaining the will in the probate, and pending the preparation by the contestants for their appeal, which proceeded so far as securing a bond, giving the notice, and preparing the grounds of appeal, such preparation made by the counsel for the proponent of the will as would meet the issues probable in the case; and, in addition to that, the counseling and directing the executrix five months, closing up, converting her estate into money, involving something like 350 visits to her house, she being an old lady, not wishing to go to the office,—what should you say would be a fair and reasonable charge for those services in addition to the retainer, where it takes nearly the whole time—the principal part of an attorney's time—for five months?"

The answer of the witness was, "Ten thousand dollars."

This question was objected to as immaterial, and not containing the facts in the case. The objection was overruled, and exception taken.

The following question was propounded to Maj. Levi T. Griffin, of Detroit, by the plaintiff:

"On the eighteenth day of June last, Charles W. Richardson, of Alpena, died, leaving an estate, consisting of a lumbering plant, comprising a saw-mill and all the equipments, of the value of about a half a million of dollars; also other property consisting of personal property and real estate, the whole aggregating about a million of dollars. The lumbering

operation and business was in active operation at the time of his death. This estate was devised to his wife, Diana Richardson, the defendant in this case.

"On the twenty-fourth day of June, Mrs. Richardson retained me as chief counsel to take charge of the administration of that estate, to secure the probating and proving of the will, the continuing of the business pending the closing of the estate, and the entire charge, counseling, and managing of the estate in every particular. What would you say, under all the circumstances, would be a fair and reasonable charge?

" *Witness.* What time did the services cease?

" *Q.* They extended over a period from the twenty-fourth day of June to the twenty-second day of November.

" *Witness.* Was there any threatened attack on the will?

" *Q.* There were 12 heirs of the deceased, that commenced a contest in the probate court. That consisted of filing the necessary grounds of attacking the will, and attending to and proving of the will. The contestants appeared by counsel, cross-examining the witnesses produced to establish the will. After the establishment of the will, the contestants proceeded to take an appeal, assigning the grounds of appeal, and procuring the bond. But the question I put to you first, is whether a retainer would be proper; and, if so, what amount as a retainer in the first instance.

" *Witness.* As I know something about the facts, I would prefer to answer your question as to what your services are worth in connection with that retainer.

" *Mr. Kelley.* Then I will add to that question that you may cover the whole ground. The services continued from the twenty-fourth of June to the twenty-second of November, during which time the estate was turned over to the special administratrix, Mrs. Richardson, her appointment being made by the probate court, and continued during six weeks pending the probate of the will. During that time I made the necessary inventory and appraisal of the estate,—the entire estate,—as required; took all the necessary steps, under the administration, to obtain the letters authorizing her to proceed with the business, and prepared for the contest.

" *Witness.* How much was the estate worth?

" *Mr. Kelley.* About one million of dollars."

The question was objected to by defendant as incompetent, and containing matters not the subject of expert testimony.

The objection was overruled, and an exception taken. Witness then answered:

"Perhaps it is proper for me to state that I know about the will, and I presume there is no dispute about it on the other side, as to when it was made, and what the condition of Mr. Richardson was pecuniarily, at least what it approximately was, at the time the will was made; and I have also had occasion to be at Alpena some two or three times in litigated cases, in the last five years, and knew Mr. Richardson, and the large property interests he had there. I should think, if Mr. Kelley was chief counsel for Mrs. Richardson in this matter, and saw her safely through, securing the estate for her against all comers, so to speak, and was the counsel on whom she relied, and had the responsibility of securing for her, and for her alone, the vast interests of Mr. Richardson, said to be about a million dollars,—all of that, I should think, from my own knowledge of the matter,—that she ought to be willing and ought to pay him for the services $25,000 out of that million; he being a lawyer, as I know, of eminent standing at the bar, and probably the foremost lawyer in Alpena, and probably as good as any in that section of the State, if not in the whole State.

" Q. In your judgment, Mr. Griffin, under all the circumstances, do you think that would be a reasonable and fair charge ?

"A. I think that it would be a reasonable charge. She ought to pay, and pay it cheerfully."

On his cross-examination the witness said:

"I base my estimate and judgment as to what would be a reasonable charge for the plaintiff's services, upon what I know of the estate, the condition of the parties, the amount involved, the result attained, the professional standing of the attorney, and the responsibility assumed."

Witness F. A. Baker, of Detroit, was asked the following question by Judge Kelley:

" Question No. 8. This action is brought to recover for professional services alleged to have been rendered by the plaintiff for the defendant. The statement of the services is substantially as follows:

"On the eighteenth day of June last, Charles W. Richardson, of Alpena, died, leaving an estate consisting of a saw-

mill, lumbering plant, of the value of about half a million dollars, in active operation; also notes, mortgages, accounts, secured and unsecured, real estate, vessel property, money, stocks, etc., which, together with the lumbering plant, aggregated about one million dollars. The business was in active moving operation at the time of his death. The whole of the estate was bequeathed and devised to his widow, the defendant in this suit, by a will made 29 years prior to his death. This will was actually executed in Canada, although Richardson, at the time, was domiciled in the state of Maine. At the time of making the will, the deceased was possessed of no property in the State of Michigan, and no real estate, except a building lot in a small village in the state of Maine; all the property left at his death having been acquired in Michigan after the making of the will.

"On the twenty-fourth day of June, six days after the death of Mr. Richardson, his widow, Diana Richardson, the defendant in this case, a woman 61 years old, employed the plaintiff as her chief counsel to take charge of, advise, and counsel her in the administration and management of the estate. There were 12 heirs of the deceased,—six brothers and sisters of the half blood, and six brothers and sisters of the full blood,—who denied the validity of the will, and threatened a contest. The plaintiff undertook to discharge these duties, and prepared, and took the necessary steps at the probate court, for the proof and probating of the will; also petitioned said court, and secured the temporary appointment of the defendant as special administratrix to take possession of the estate, and continue the business pending the probating of the will; made a complete inventory and appraisal of the entire estate; constantly and daily advised as to the management of the estate, and its business. A contest was actually made by the heirs. They secured counsel in Detroit and other places, appeared in the probate court by counsel, and filed an answer to the petition for the probate of the will, and denied its validity. The will was admitted to probate, and the contestants prepared for the appeal, gave the notice, reasons for grounds of appeal, and the necessary bond.

"A few days before the expiration of the time in which to complete the appeal, and on the thirtieth day of August, 1886, defendant compromised with the heirs by paying $120,000. Plaintiff continued as sole adviser of the defendant until the estate was fully closed, and the greater portion, including the

mill plant and real estate, was converted into money, or its equivalent.

"The services required of the plaintiff were such as to take nearly his entire time for the period of five months, making about 350 visits to the house of defendant, she being an old lady, and requiring the plaintiff to attend her there for counsel.

"Now, upon this hypothesis, the plaintiff investigating and preparing to meet every legal question that would naturally arise in the administration of such an estate, also making every preparation to meet the contest upon the will, both as to the legal questions and the questions of fact, what do you say would be a fair and reasonable charge, under all the circumstances?"

The question was objected to as incompetent,—not calling for expert testimony. Objection overruled and exception taken.

"*Answer.* It is almost impossible to do anything more than give a person's opinion as to what he thinks ought to be charged in such a case. Estates of similar character are very rare in Michigan, and there are but one or two instances in the city of Detroit that will enable me to form any judgment as to what I know has been charged. So that it would be my general opinion, more than anything else, as to what I thought would be reasonable under the circumstances. As I understand it, this estate was worth about a million dollars, and has been converted into money, and realized about that amount, according to your statement; and the will was an ancient will, executed in another jurisdiction; and Mrs. Richardson employed you to take charge of her interests, and devote all the time that was necessary to protect her interests in the matter. I don't think it would be an unreasonable charge if Mrs. Richardson should pay you $25,000."

John Atkinson, of Detroit, was also examined by the plaintiff, and, in answer to question No. 8, said:

"Well, I should say fifteen to twenty-five thousand dollars. I would not be able to estimate accurately the actual services rendered, nor the effect it might have in almost breaking up a man's other business practice, where he devotes himself entirely to one case. I should think $15,000 a very low charge. I should think $25,000 a very reasonable charge;

and it would depend a little upon the character of the client, if it was an agreeable person to consult with, or a cross, crotchety client.     It is pretty hard to estimate.

"*Question.* In making your estimate, colonel, have you included anything more in counseling, as to the management of the business, than would naturally arise in an estate of that kind,—than would be required of an attorney and counselor?

"*Answer.* No, I do not.  I simply include the careful preparation that a man ought to make in a case involving that amount.    I think he ought to devote his entire time to it, or very nearly so.   I think that it would practically break up his business, and that for years his business would be somewhat affected by that break.    Then, I think the responsibility and care and everything would be very wearing upon a lawyer ; and, if he was called upon in five months for 350 consultations with a client at her house, I should think that almost any price he might charge would be reasonable.   That would be about four or five calls a day."

The same objection was made to the question as when put to Mr. Baker.

Mr. Sleator, of Alpena, testified, on the part of plaintiff, in answer to question No. 8, when propounded to him, against the objection that the hypothesis is not based upon the facts in the case, and as immaterial and irrelevant, that—

" Taking into consideration all the elements embodied in the question, and from my knowledge of Mr. Kelley, his standing and ability as an attorney, the amount of property involved, and the importance of the estate, the difficulties of the questions which originated and arose and were suggested by the will referred to in the question, the amount of services and the time that they covered, the client and the result to her, I should say that at least $25,000."

Counsel for defendant moved to strike out the answer, as embodying elements not stated in the question, but the motion was denied.

The foregoing rulings to the several questions stated, with the exception of two, which will be noticed hereafter, present the main grounds upon which a reversal of the judgment of the circuit is asked, and, as will be noticed, all these questions

are intended to be hypothetical, requiring answers as such, and assume that the witnesses have no knowledge of the facts stated in the questions, or of the case to which they are supposed to relate.

In such cases this class of testimony is proper, when it is given upon proper interrogatories, based upon facts properly stated therein. The rule admitting such testimony was recognized and established at a very early day in the history of jurisprudence. See Rogers, Exp. Test. §§ 2, 3, and cases there cited. The rule is exceptional to that which requires that a witness shall state facts, and not opinions or conclusions deduced from the facts. It grows out of the necessities of the case, and must therefore always be limited in its application. It has for its object the ends of justice, and, when wrongly applied, never fails to defeat the object of its creation. It is based upon the principles of evidence, which, as has been said,—

"Are founded on our observations, on human conduct, on common life, and living manners. They are not just because they are rules of law; but they are rules of law because they are just and reasonable."

Testimony of the character we are now considering is not only regarded as admissible, but is not unfrequently the best attainable to prove the facts in controversy, and may be acted upon by the jury in determining the amount to be recovered. *Reynolds v. Robison,* 64 N. Y. 589; *Williams v. Brown,* 28 Ohio St. 547; *Beekman v. Platner,* 15 Barb. 550; *Garfield v. Kirk,* 65 Id. 464; *Thompson v. Boyle,* 85 Penn. St. 477; *Head v. Hargrave,* 14 Cent. Law J. 389; Lawson, Exp. Ev. 63; *Barker v. Railroad Co.,* 3 Thomp. & C. 328; *Allis v. Day,* 14 Minn. 516; *Kempsey v. McGinniss,* 21 Mich. 123.

And it is held in some cases that, where a hypothetical question is put to an expert witness, the question should be based on what has already been proved in the case. *Hathaway v. Insurance Co.,* 48 Vt. 335; *In re Ames,* 51 Iowa, 596

(2 N. W. Rep. 408); *Dexter v. Hall*, 15 Wall. 9; *Heald v. Thing*, 45 Me. 392. Such, however, is not the rule in the state of New York (*Harnett v. Garvey*, 66 N. Y. 641); and I do not understand it has been adopted in this State (*People v. Sessions*, 58 Mich. 594, 26 N. W. Rep. 291).

I think, where the witness has no knowledge of the facts, the question may be put upon an assumed state of facts, before the proof of them is made, and the opinion of the witness may be taken thereon; but, before the case should go to the jury under such circumstances, it should appear that testimony was given clearly tending to prove each material fact thus assumed; and, if not, the question, and all the testimony relating to it, should be stricken out by the court. *Turnbull v. Richardson, ante,* 400, opinion by MORSE, J. Such assumption, however, must be of facts only, and of all the facts upon which a pertinent and relevant answer is desired. The facts should be clearly and plainly stated. They should contain no argument or presumptions, or be ambiguously stated. They should not contain conclusions, uncertainties, probabilities, or possibilities. Those should be left and settled by the other testimony in the case.

The facts contained in a hypothetical question usually must be such that all inferences to be drawn therefrom necessarily relate materially to the issues involved in the case, and which inferences can properly be made only by persons of special skill, learning, or experience in the matters to which the facts refer. *White v. Baily,* 10 Mich. 155; *Beaubien v. Cicotte,* 12 Id. 459; *Kempsey v. McGinniss,* 21 Id. 138; *Hitchcock v. Burgett,* 38 Id. 508; *Underwood v. Waldron,* 33 Id. 235; *State v. Felter,* 25 Iowa, 67, 74; *Polk v. State,* 36 Ark. 117: *Spear v. Richardson,* 37 N. H. 23; *Dexter v. Hall,* 15 Wall. 9; *Jerry v. Townsend,* 9 Md. 145; *Bishop v. Spining,* 38 Ind. 143; *Dickinson v. Fitchburg,* 13 Gray, 546, 556; *Crowley v. People,* 83 N. Y. 464; *Stuart v. State,* 1 Baxt. 178, 189; *Davis v State,* 35 Ind. 496; *Haggerty v. Railroad Co.,*

61 N. Y. 624; *Van Deusen v. Newcomer,* 40 Mich. 90, 120; *Railroad Co. v. Huntley,* 38 Id. 537; *People v. Sessions,* 58 Id. 607 (26 N. W. Rep. 291); Rogers, Exp. Test. §§ 10, 13, 18, 19, 24; *Champ v. Com.,* 2 Metc. (Ky.) 18; *Cooper v. State,* 23 Tex. 336; *Dolz v. Morris,* 10 Hun. 201; *McMechen v. McMechen,* 17 W. Va. 683, 689; *Hunt v. Gas Light Co.,* 8 Allen, 169.

In the case of an attorney who sues for the value of his professional services, the facts which are made the basis of a hypothetical question from which it is proposed to show their value, where the witnesses have no knowledge of the services for which the plaintiff was retained, or which were performed, must show the attorney competent, and retained for the professional services required, the places where to be performed, and under what circumstances, and the particular services performed. If charges are made for counsel, and relied on, the subjects upon which it is had, and to what extent, and its character, should be stated, that some idea may be obtained of its importance, and the responsibility assumed in giving it, and in performing the service; and no fact should be left to be anticipated, found, or for conjecture by the witness, or to be interpreted by the jury. The answer should be confined to the facts above stated, and nothing should be added to or taken from them by the witness. *Kempsey v. McGinniss,* 21 Mich. 138; *Underwood v. Waldron,* 33 Id. 235; *People v. Millard,* 53 Id. 75 (18 N. W. Rep. 562).

Before, however, the witness should be allowed to answer such hypothetical question, it should be made to appear by the testimony, unless the fact is conceded, that the witness is fully qualified to understand every fact stated in the question, and the relative bearing it has to the subject to which the question refers, and that he has the ability and experience to give a proper answer thereto. *McEwen v. Bigelow,* 40 Mich. 215; *Daniels v. Mosher,* 2 Id. 186; *State v. Ward,* 39

Vt. 225; *Tyler v. Todd,* 36 Conn. 218; *Jones v. Tucker,* 41 N. H. 546; *Brown v. Railroad Co.,* 1 How. App. 52, 124.

The statements of fact contained in the question must not only be consistent with the idea that the services have been performed by the plaintiff to the extent claimed for by him, but must show the particular services rendered, so far as it can be reasonably done, and that they have been actually performed. It is then that the witness should be permitted to speak of their value. *Fraser v. Jennison,* 42 Mich. 227 (3 N. W. Rep. 882); *Turnbull v. Richardson,* above referred to.

Under these rules, which are well settled in this State and elsewhere, I think the defendant's objections, each and all of them, were well taken to the foregoing hypothetical questions.

We will now consider, for a few moments, each of these questions. In the first, the plaintiff states a hypothetical question to witness Dickinson, and upon it asks, "What would be a fair and reasonable retainer?" In his question he states all the services which he claims to have been performed, but does not state he was retained to perform all of them, and in the question some of the services stated were not professional.

A retainer is the securing of an attorney at law to perform professional services in the business of another, in such manner that he cannot engage himself to or perform any service in the employment in the interest of the opposing party, or in any manner do anything in the business prejudicial to the party employing him, and the fee paid for this purpose is a retaining fee. It has no necessary connection with the charges made for actual service rendered, and the nature and character of the business can only be properly referred to for the purpose of determining whether or not it is professional, and the amount of responsibility likely to be involved and assumed.

The retaining, it will be noticed, was within six days after the death of Mr. Richardson, and, so far as appears in the record, before any objection was made to the will, and before any plans had been matured by Mrs. Richardson as to what she would do with the estate, or how she would manage it. The retainer only applied to professional services, and none other could be required of him under it; but included in the question were services in carrying on a lumber business at a plant worth a half million dollars, and managing all the other business of the estate, which consisted in looking after a large water-power and saw-mill at Alpena, which manufactured about 20,000,000 feet of lumber per year, and a large amount of pine lands in adjoining counties, pine and redwood tracts, and timber interests in Canada and California, the running of 11 steam and sail vessels on the lakes, and the management of all the business these several enterprises involved.

It will be readily seen that the engagement of the plaintiff to perform the business of these several kinds of non-professional pursuits was not for a professional undertaking in the plaintiff's capacity as a lawyer, and it should not have been included in the question put to the lawyer witness. It was in no sense subject-matter upon which to base an expert question. Neither does it appear that Mr. Dickinson knew anything about running a farm, a saw-mill, or a steam-boat, or that he knew what a lawyer should have for looking after such work. I think the question was clearly within the objections of defendant's counsel.

It does not appear, however, that the question put was answered. The witness assumed several additional facts to those contained in the question, and then made his answer. This was certainly improper. The defendant's motion to strike out both question and answer should have been granted.

The second question put to Mr. Dickinson, and his answer thereto, have all the infirmities contained in the first. This

question relates to the value of the services rendered. It includes the statement contained in the first question. It includes the management of the business until it was closed up. It says the plaintiff acted as the defendant's personal adviser in everything, as to all matters of her business, in managing and settling up her estate, so as to convert it into money; that he made 350 visits at her home for consultation; that he succeeded in closing up the estate, so that she converted it into money, or the principal part of it. Not one of these facts entered into a proper hypothetical question to be put to this witness. They did not refer to professional services, nor did it require a professional man to perform the services stated. Yet they form the staple of the question upon which the opinion of this professional witness was asked and given.

The husband, who had performed all these services for years, was not a lawyer, and, if living, would no doubt have thought very strange of an attempt to prove the value of such services by a lawyer who had never had experience in any branch of the business mentioned. These services evidently constituted the great bulk of the work, as no contested litigation, or in fact any other kind, seems to have been required, excepting the probating of the will, appointing the widow special administratrix pending the probate, and drafting papers therefor.

It is true, the question stated other matters, such as superintending the making of the inventory, and the appraisal of the estate; that the plaintiff was her chief counsel, and the length of time he acted as such; that a contest of the probate of the will was threatened by heirs, but which was silenced by a settlement in less than 60 days; that preparation was made to defend against an appeal, which was never taken; that the plaintiff examined carefully all legal phases of the contest, and the probable questions that might be raised, and consulted authorities, and made a full brief on an appeal

that was never made. These additional facts do not help the question, or make it any more proper. They refer to services proper in character for an expert, without giving any idea as to the amount of service performed, or any adequate dea of the amount required to be performed.

Take, for instance, those relating to the making of the inventory and appraisal. The plaintiff says he superintended the making of it. This gave the witness and jury no idea of the amount of work required or performed in the perfecting of it. Whether it was made in Alpena, or how many different states and territories he visited to find the property, and the time spent in making and completing it, does not appear; neither does it appear that any legal services were necessary in securing and filing the same, or that any legal question arose in the progress of that work.

Again, the plaintiff says, in the question, that he had about 350 consultations with the defendant in all that he did for her; but it is not stated that one of these was upon any legal matter, nor is the nature or character of any one of these consultations given in the question. And so we might analyze other portions of the question, and further show its impropriety and unfairness; but enough has been said to disclose the inadmissibility of the question. The magnitude of the estate, its business interests, and the non-professional services it required to carry it on for a few months, seems to have monopolized and controlled everything in the question, and completely obscured the limitations the rule places upon the testimony of professional experts.

Aside from the instances noticed, it nowhere appears that any professional services were rendered by the plaintiff for the defendant; and the value of the professional service alone was not made the subject for the experts to pass upon, and which was the only testimony they could properly give.

The questions and answers appearing in the testimony of Alfred Russell are subject to all the objections made to the witness Dickinson's testimony, and the objections thereto, and the motion to strike out the questions and answers, made by defendant's counsel, should have been granted.

The same ruling should have been made in regard to the testimony and questions relating to witnesses Griffin, Atkinson, Baker, and Sleator. The questions put to them were based upon the same imperfect and wrong hypothesis, and the objections thereto should have been sustained, and their answers stricken out. And I may say that the answers given were objectionable in another respect than those already stated. They all assume facts not stated in the questions at all, and all contain more or less argument why the plaintiff should receive the amount of money they fix upon in their answers. They go so far as to say, in some of the answers, what the defendant should expect and ought to do, instead of stating their opinion as to the value of the service queried after.

Take, for instance, the testimony of Maj. Griffin, in his answer, who after giving the amount, as he states it, said: "She ought to pay, and pay it cheerfully."

"She ought to be willing and ought to pay him for the services $25,000 out of that million."

Witness Baker, in answer to one of the questions put to him, says:

"She should expect to pay very liberally, and counsel would have a right to expect very liberal pay."

And in the answer of Col. Atkinson we find this:

"I think he ought to devote his entire time to it, or very nearly so. I think that it would practically break up his business, and that for years his business would be somewhat affected by that break. Then, I think the responsibility and care and everything would be very wearing upon a lawyer; and, if he was called upon in five months for 350 consultations with a client at her house, I should think that almost

any price he might charge would be reasonable. That would be about four or five calls a day."

These statements should not have appeared in the answers to the questions to which they refer. The arguments were incompetent and mischievous, and ought not to have been allowed, against the objections made by defendant's counsel. They were seriously prejudicial, and especially so when we take into consideration the high standing of the witnesses in their profession in the State.

Some of the embarrassments to the rights of the parties in this case, by the course pursued by the plaintiff in these hypothetical questions, and the answers thereto given, are well illustrated in the cross-examination of Frank H. Canfield, an able and distinguished lawyer of Detroit, and witness on the part of the defendant. The following is a portion of his examination:

"Mr. Canfield, taking a case where the estate consists of personal property to the extent of about six or seven hundred thousand dollars, where its condition was that of a lumber manufacturing business, employing a large number of men, manufacturing from fifty to one hundred thousand feet of lumber a day, involving nearly a million dollars, in active operation, to be looked after, what should you say would be a fair and reasonable retainer to charge, in the first instance, upon being retained to look after it ?

" *Witness.* You mean as counsel for the party carrying on the business?

" *Q.* To take the sole charge and control of the counseling and management of the business for the widow of the deceased, and also including the probating of the will.

" *Witness.* If I understand your question, it includes services other than what are legitimately the services of a lawyer. It includes the conduct and management of the business by him. So far as that is concerned, it would be very difficult for me to express an opinion.

" *Q.* Let me now ask you this question: Take, for instance, the property of the deceased, aggregating a million dollars, of the nature of which I have stated, a business in actual operation at the time of the decease of the husband, what would be a fair retainer in the first instance, where the

attorney was expected to take the sole control and management of the legal phases of the estate, probate the will, and close up the estate, where a million dollars was the aggregate of the estate?

"*A.* Your question is, what would be a fair and reasonable retainer?

"*Q.* Yes, sir.

"*A.* As I stated before, if there was no litigation expected, I think that a thousand dollars would be a reasonable retainer. There might be services to be performed in addition to that, however."

The question was objected to by defendant as incompetent, and it involved the question of lumbering business. The objection was overruled, and an exception taken.

The plaintiff read a question on cross-examination to the witness, as follows:

"Do you think $25,000 charge for an attorney to take charge of an estate that aggregated a million of dollars, one-half of it consisting in a manufacturing business of lumber, that was in actual operation, where a contest was anticipated, and actually made up to within a few days of the time for appeal from the decision of the probate court, where the estate was closed up within six months, the most of it converted into money, and where, in the conduct of that business,—legal and business portions of it as well,—he had employed his exclusive time, and had been called to the residence of his client 400 times to consult her on the subject of the will, and the estate and business?

"*Witness.* Does he do all this himself? Does he convert the property into money, so that he is not only the adviser, but the practical administrator of the estate?

"*Q.* So far as bringing about the result and accomplishing the business, the attorney did the work.

"*Witness.* Did the money pass through his hands?

"*Q.* No. The papers,—transfers.

"*Witness.* I mean the representatives.

"*Q.* Some portion of it; some not. Do you think $25,000 would be unreasonable?

"*A.* I should think that was a pretty large salary."

The question was objected to for the reason that it is asking the witness as to no expert testimony, or any expert

knowledge, and is incompetent. Objection overruled, and exception taken.

" *Q.* Then let me ask you this question: What do you think would be a fair and reasonable charge for an attorney to make where he is employed to take the sole charge of a case such as I have mentioned, and where an actual contest was made by eminent counsel on the other side, and where the result was favorable to the proponent of the will, and where, after the probate of the will, the attorney continued to counsel and direct, and do all that was necessary to close up the estate, and also to counsel and direct in the management of the estate for the widow, from the twenty-sixth day of July until the twenty-second day of November, closing up, assisting to convert the most of it into money, or its equivalent, where the party had required the attorney to make about 400 visits to her residence for the purpose of counseling with her?

" *Witness.* How many months did you say were occupied ?

" *Q.* This latter part of the question is from the twenty-sixth day of July until the twenty-second day of November.

" *Witness.* That is a pretty hard question to answer.

" *Q.* Under those circumstances, where the estate was bequeathed to the widow, a million dollars, there were no children of the marriage, and the widow was an old lady, 61 years old, without any heirs, except two brothers, with these services being performed, what do you think would be a fair and reasonable charge? [Objected to as incompetent and irrelevant.]

" *Q.* For the business management, services, and all?

" *A.* So far as the business management is concerned, I want to say that I do not feel myself competent to express an opinion. As to the strictly legal part of the services, while a person could express an opinion which would be more satisfactory to himself and to others if he saw spread before him just what had been done, my impression is not less than five thousand nor more than eight or ten thousand dollars would be a fair compensation. To my mind, there are so many contingencies, so many things to be considered, that it is difficult to express an opinion."

The questions put to this witness upon his cross-examination were all subject to the objections made to them, and, as

suggested by the witness, were not proper expert questions, and the answers were very suggestive.

Substantially the same questions were put to William A. Moore, of Detroit, by counsel for plaintiff on the cross-examination, and he found the same difficulty in answering as did Mr. Canfield, and they were all objectionable for the same reasons. The testimony of the defendant's other witnesses does not appear in the record. It is not claimed that any of these questions put on cross-examination were for the purpose of testing the ability of the witness.

It is claimed that no reasons appear in the objections as grounds upon which they are made, and therefore, under the previous decisions of this Court, the positions taken by defendant's counsel are not tenable. The rule referred to has no application where the objection is one of incompetency, and such is the objection here. *Gilbert v. Kennedy*, 22 Mich. 141; *Comstock v. Smith*, 26 Id. 323; *Jennison v. Haire*, 29 Id. 215.

My attention has been directed to the authorities relied upon by my Brother CHAMPLIN, to sustain the majority opinion in the case of *Turnbull v. Richardson, ante*, 400, and therein cited as conclusive against the views herein expressed, and which it is thought ought to be decisive of the qustions discussed.

A different conclusion, however, it seems to me, must be reached on a careful review of those cases. Before doing so, we should bear in mind the particular fault complained of in these hypothetical questions. It is this: While the only object of the testimony is to prove the value of professional services, no such services are described. The questions do not state what the services were, nor the amount thereof rendered. The questions state facts relating to three or four kinds of non-professional business; state that the plaintiff performed a large amount of services in these, and some professional service; include the whole in the hypothesis; and

then ask the lawyer expert to give his opinion as to the value of the whole service.

The objections made in this case, I do not think are, as suggested, based on the notion that testimony concerning legal services is scientific, and only open to lawyers, and that testimony relating to business services has no scientific basis, and is not expert testimony for that reason. A lawyer may be entirely competent, and frequently is, to give the value of services in almost any kind of business; but no one is competent to give the value of service in any kind of business of which he knows nothing.

In this case it was the value of professional labor of which the witnesses were called upon to speak, and it does not appear that they knew the value of any other kind contained in the question; and the objections to the questions were based upon the ground that professional services and non-professional labor could not be bunched together in the same hypothetical question, and then a value placed upon the whole by a professional man, gauged by the professional scale of charges, when he knew nothing of the value of such non-professional labor, and which constituted the great bulk of the service alluded to in the question. And I think the objections were well taken. But now let us examine what we are referred to for a contrary doctrine.

In *Jackson v. Railroad Co.*, 2 Thomp. & C. 653, the facts stated in the question are not given, and the only point made upon it was whether the question was admissible without actual knowledge of the facts stated, and the court held it was proper, and the case is cited in 58 N. Y. 623, where the same ruling was had.

In *Beekman v. Platner*, 15 Barb. 550, the only question was what were the services of the plaintiff, a lawyer, worth, by the day, in trying causes, and what they were worth for drawing an ordinary contract.

In *Filer v. Railroad Co.*, 49 N. Y. 42, was a question to a medical expert. The question stated the injury to the party, which occurred in November, 1864. The nature of the injury, and manner it occurred, were particularly described in the question, and upon it the doctor was asked, what, in his opinion, was the cause of an abcess, which subsequently appeared.

In the case of *People v. Augsbury*, 97 N. Y. 501, the respondent's counsel, upon cross-examination of a physician, for the purpose of testing the correctness of his ideas as to what manifestations would tend to prove insanity in the respondent, was allowed to put hypothetical questions containing facts different from those in the case, but of a similar character.

In *Reynolds v. Robinson*, 64 N. Y. 589, a plaintiff brought suit for his wife's services in nursing a person who was afflicted with cancer. A physician, who knew the value of that kind of service, and who was acquainted with the case, was permitted to give the value of such service; but it was held error to allow another physician to give his opinion of such value, who had only heard the other witness testify to the condition of the patient, and the value of the services rendered.

In *Blake v. Griswold*, 103 N. Y. 429 (9 N. E. Rep. 434), it was held that a witness who had seen and examined mining property, and was acquainted with its value, might testify to its value.

In *State v. Felter*, 25 Iowa, 75, it is decided that a physician who knew the respondent, and from his examination and observation became acquainted with his mental condition, might give his opinion as to his sanity or insanity, and that a physician cannot be permitted to give his opinion in such case, upon hearing the testimony given upon the trial and relating thereto, and from observing the conduct of the persons in the court-room.

*Goodwin v. State*, 96 Ind. 554, holds that there was no error in refusing to allow a doctor who was giving expert testimony to give a correct definition of a word used; that it is not necessary, in a hypothetical question, to embody therein all of the matters of which there is any evidence, but it is sufficient if it contains the facts material, and fairly within the range of the evidence in the case, as claimed by counsel putting the question.

In *Railway Co. v. Falvey*, 104 Ind. 409 (3 N. E. Rep. 389), it was held, a party seeking an opinion from a medical expert may assume in his hypothetical question such facts as he deems proved by the evidence, and the skill and knowledge of the expert may be tested by the use of hypothetical questions; that, when there is competent testimony given on both direct and cross-examination of such expert, the party calling and examining him cannot, on his motion, have all of his testimony stricken out. The case further holds that, if part of the material facts assumed in the question put to a medical expert shall be found by the jury not proved, this will only weaken the opinion to that extent.

We find nothing in *Railway Co. v. Wood*, 113 Ind. 544 (14 N. E. Rep. 572), needing particular mention. It only says, upon the subject under consideration, that it is competent for a medical expert to state, after having examined the patient, and described her condition, what was, in his opinion, the cause of the symptoms he observed; that a party may assume such facts in his question as he believes the evidence in the case tends to show; and that the hypothesis need not state all the substance of the evidence.

In *Cowley v. People*, 83 N. Y. 464, it is only decided that the party may, in framing the question, state the facts therein as he assumes them to be on his theory of the case.

*Quinn v. Higgins*, 63 Wis. 664 (24 N. W. Rep. 482), decides that the hypothetical question should not be rejected because it assumes as proved all the facts which the evidence tends to

support, when the court does not think them all established by a preponderance of evidence.

In *University v. Parkinson*, 14 Kan. 159, a lawyer was called to prove the value of legal services, where he had personal knowledge of what they were, and was allowed to give his opinion.

In the case of *Mercer v. Vose*, 67 N. Y. 56, it is held that the plaintiff, a lawyer, may be sworn as to the value of the service he himself has rendered, and he may have the opinion of other attorneys as to the value, who knew of the services performed, or he may have their opinion of their value upon a hypothetical question containing a statement of the services.

*Harland v. Lilienthal*, 53 N. Y. 438, decides that, in an action by an attorney for his services, evidence to show the nature and importance of the controversy in which the services were rendered, and the gravity of the case, is proper.

In *Harnett v. Garvey*, 66 N. Y. 641, the plaintiff was a lawyer, and sued for his services in rendering counsel; and a brother lawyer was asked for his opinion as to the value of such service upon a hypothetical question stating that the counsel was given in a case involving the right of the state to maintain an action, in which $500,000 was involved, and that the plaintiff spent most of his time for three weeks in examining the question. The objection to the testimony was that there was no evidence to sustain the assumption in the question of the value of the property. The court admitted the opinion of the witness, holding that the amount involved was within the range of the testimony.

In *Beaubien v. Cicotte*, 12 Mich. 459, it was decided that persons not experts, who were acquainted with the testator, might give their opinion concerning his capacity to make a certain will.

In *Furniture Co. v. Ransom*, 46 Mich. 416 (9 N. W. Rep. 454), it was held that the opinion of a witness, living in one

place, as to the value of services performed in another, might be given; and, in the absence of evidence to the contrary, it would be presumed, on error, that he knew what the value was at the latter place.

In the case of *People v. Hare*, 57 Mich. 505 (24 N. W. Rep. 843), it was held that a physician who had made an examination of the body of a man who had been killed, and then thrown into water, might give his opinion as to the cause of death, and whether it occurred before or after he was put into the water.

In *People v. Sessions*, 58 Mich. 607 (26 N. W. Rep. 291), it was held, where medical testimony was sought, that it should be confined to scientific deductions, and that the hypothetical question calling for the opinion of witnesses should not state common facts, suspicions, or motives.

In *Gartner v. Beller*, 54 Mich. 332 (20 N. W. Rep. 65), the action was brought for professional services, and evidence was put in by the plaintiff of the value of the services, which were described. The defendant introduced a bill rendered for the services, and upon which part payment had been made. The Court held the testimony sufficient to sustain a recovery if the jury believed it.

The case of *Mortgage Co. v. Henderson*, 111 Ind. 24 (12 N. E. Rep. 88), decides that an attorney who is employed to make loans, and collect the moneys when due, and who performs professional services for the principal when called upon to do so, may collect a reasonable compensation for both kinds of service in the suit.

In *Railroad Co. v. Nichols*, 24 Kan. 242, it was held that an attorney at law might testify to the value of services for trying a cause in justice's court, when recovery for a cow worth $200 was sought against the railroad company.

These are the cases outside of our own State relied upon to sustain the judgment at the circuit. In none of these authorities do we find it held permissible or proper for an expert

witness to answer a hypothetical question propounded for an opinion of the value of professional service, unless the service is stated in the hypotheses. Neither have I been able to find any authority cited by the learned counsel upon either side, or elsewhere, asserting such a doctrine; and, even where the questions are put for the purpose of testing the knowledge of the witness, the service must be stated, though it may vary from that shown by the facts in the case. In the single instance where the question is put to test the qualification of the witness upon cross-examination, the questions must be hypothetical, and the facts stated must relate to the subject-matter queried after.

It has been the doctrine of this Court for years that expert testimony should be confined within the narrow limits which the necessity that permits it at all allows to it, under the rules which are herein stated. And after observing the danger to the rights of parties arising from its improper use in ascertaining and fixing liability, and establishing facts, during a period of over 30 years, I have become satisfied that in a strict obedience to the rules suggested, and heretofore closely followed by this Court, lies the only assurance of safety; and that this conclusion is supported, not only by the experience of every practitioner at the bar, but by reason and common sense. I can find no excuse for a departure, in this case, from the uniform course of our decisions upon this important subject. *White v. Bailey,* 10 Mich. 155; *Beaubien v. Cicotte,* 12 Id. 459; *Railroad Co. v. McDonough,* 21 Id. 165; *Kempsey v. McGinniss,* Id. 123; *McGinnis v. Kempsey,* 27 Id. 302; *Page v. Wells,* 37 Id. 415; *Clark v. Field,* 42 Id. 343 (4 N. W. Rep. 19); *People v. Niles,* 44 Id. 606 (7 N. W. Rep. 192); *Furniture Co. v. Ransom,* 46 Id. 416 (9 N. W. Rep. 454); *Ritter v. Daniels,* 47 Id. 617 (11 N. W. Rep. 409); *People v. Hall,* 48 Id. 482 (12 N. W. Rep. 665); *People v. Hare,* 57 Id. 513 (24 N. W. Rep. 843); *People v. Sessions,* 58 Id. 594 (26 N. W. Rep. 291); *Daniells v. Aldrich,* 42 Id.

58 (3 N. W. Rep. 253); *Van Deusen v. Newcomer*, 40 Id. 90; *People v. Brown*, 53 Id. 531 (19 N. W. Rep. 172).

It was said in *Williams v. State*, 64 Md. 384 (1 Alt. Rep. 887), in framing a hypothetical question it is not necessary to include all the facts claimed for the evidence in the case relating to the subject of the inquiry; but it is equally true, when, as in this case, the value of all the service claimed for in the case is intended by the question to be called for, all the material facts upon which the claim is based, showing the kind, character, and extent of such service, should be stated; otherwise the jury may be entirely misled by the opinion given by the witness. And if, as was done in this case, services non-professional as well as professional may be included together in the same question, and the value of the whole given in the opinion of the witness, and all are measured by the standard of professional charges, then, indeed, would the administration of the law in the case cease to be governed by the rules of common sense and justice, and become a delusion and a snare to those who have a right to resort to our courts to obtain justice.

It is matter of common knowledge that the compensation for services of men of learning, skill, and experience, in the discharge of their duties in the professions to which they belong, is rated far above the services required to be performed in the common and ordinary avocations of life; and the rule which would permit the compensation of the latter to be gauged by the scale of charges for the former I think is entirely unreasonable, and not supported by any authority I have been able to find. *Lombard v. Bayard*, 1 Wall. Jr. 197.

It is suggested that cross-examination furnishes the means to eliminate anything objectionable in the question put or answer given. In response to this suggestion, it is only necessary to say, what is quite familiar knowledge to the practitioner, that such a resort should never be compelled, and the

proper rule does not require it. It is the right of the party to have rejected, on his objection, any improper question and testimony when it is offered, and not be obliged to jeopardize his case by the cross-examination of an expert. Every examiner at the bar knows from experience the great danger in an effort of this kind with an expert witness, and he never feels entirely safe in making the attempt. They are usually persons of learning and experience upon the subjects treated, and often of superior ability to the practitioner who makes the examination, and by their ingenuity upon such examination, instead of exposing the infirmity existing, will so manage as to cover it from the jury.

It is said by my brothers that the learned and distinguished members of the profession who were sworn in the case found no difficulty in making answers to these hypothetical questions propounded. That, I apprehend, could not change the reason or the law upon the subject. But I do not understand from the record that such was the fact. Certainly, this was not the case with the witnesses Baker, Dickinson, Russell, Griffin, Canfield, and Moore, each of whom modified or added facts to the question before making answer.

I have taken more time and space than perhaps I ought to have done in expressing my views upon the questions raised upon this record, but they so radically differ from those stated in the majority opinion of my brethren, and as I deem the proper application of the rules governing this class of testimony of primary importance to every person against whom claims of this character are made, and which will increase as the State advances in wealth and prosperity, I have felt that I could not say less.

I cannot concur in the views taken by my learned brothers. I can but regard them as breaking down all the wholesome barriers between expert and non-expert testimony, and leaving the rights of parties litigant to be determined, not upon the actual facts in the case, but upon conjecture, and the

vague statements and hallucinations of a distorted imagination, or, as it often may be, to the discretion of unfriendly, partial, biased, and unscrupulous witnesses. Courts may thus place in jeopardy the rights of parties before them, but a proper application of the law never can.

I think the judgment in this case should be reversed, and a new trial granted.

MORSE, J., concurred with SHERWOOD, C. J.